# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF OHIO

### WESTERN DIVISION

| | |
|---|---|
| Mildred A. North, Derivatively on Behalf of CHEMED CORPORATION,<br><br>       Plaintiff,<br><br>  v.<br><br>KEVIN J. MCNAMARA, DAVID WILLIAMS, TIMOTHY O'TOOLE, JOEL F. GEMUNDER, PATRICK B. GRACE, WALTER L. KREBS, ANDREA R. LINDELL, THOMAS P. RICE, DONALD E. SAUNDERS, GEORGE J. WALSH III, FRANK E. WOOD, and THOMAS C. HUTTON,<br><br>       Defendants,<br><br>  - and -<br><br>CHEMED CORPORATION,<br>A Delaware corporation,<br><br>       Nominal Defendant. | Case No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br> **(1) BREACH OF FIDUCIARY DUTY**<br> **(2) ABUSE OF CONTROL**<br> **(3) GROSS MISMANAGEMENT**<br> **(4) UNJUST ENRICHMENT**<br> **(5) INSIDER TRADING**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, derivatively on behalf of Chemed Corporation ("Chemed" or the "Company"), files this Verified Shareholder Derivative Complaint against the Individual Defendants for breaches of their fiduciary duties as directors and/or officers of Chemed, abuse of control, gross mismanagement, unjust enrichment, and insider-trading.  In support thereof, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action seeking to remedy wrongdoing committed by Chemed's directors and senior officers between February 2010 and the present (the "Relevant Period").  During this time, the Individual Defendants breached their fiduciary duties as officers and directors of Chemed by causing it to violate federal and state law.  The Individual Defendants caused the Company's VITAS Innovative Hospice Care business to submit improper and ineligible claims to Medicare and Medicaid.  The Individual Defendants also breached their fiduciary duties by falsely representing that Chemed maintained adequate internal controls when, in fact, the Individual Defendants knew that such controls were materially deficient.  These violations of federal and state law have forced the Company to pay tens of millions of dollars to settle and defend claims and subjected it to a plethora of additional lawsuits by both the government and private litigants which seek hundreds of millions of dollars in additional damages.

2.      In addition, beginning in February 2010, the Individual Defendants caused the Company to make false and misleading statements to the investing public.  Chemed's officers and directors caused the Company to misrepresent its financial results and misrepresent its compliance with Medicare rules and regulations.  The positive statements were materially false and misleading when made because Chemed's officers and directors failed to disclose that the Company's purported growth and profits were achieved through an improper course of conduct,

including the submission of improper claims to Medicare and Medicaid.  The defendants' public statements also concealed the material fact that the Company's failure to comply with federal rules and regulations posed a material risk to the Company's future ability to participate in Medicare and Medicaid programs.  Absent compliance with federal rules and regulations, Chemed's revenues and profits would plunge.

3.     Chemed is a Delaware corporation with its principal place of business in Cincinnati, Ohio.  It is a publicly-traded company and its stock trades on the New York Stock Exchange under the ticker "CHE."  Chemed was incorporated in Delaware in 1970 as a subsidiary of W.R. Grace & Co. and succeeded to the business of W.R. Grace & Co.'s Special Products Group as of April 30, 1971 and remained a subsidiary of W.R. Grace & Co. until March 10, 1982.

4.     Chemed operates in two business segments:  VITAS Innovative Hospice Care ("VITAS"), a national hospice care provider; and Roto-Rooter, a residential and commercial plumbing and drain cleaner.  This action concerns the VITAS hospice segment of Chemed's business.  VITAS is the largest provider of hospice services to patients with severe, life-limiting illnesses in the United States, with a market share of approximately 7-8%.  During the Relevant Period, VITAS accounted for more than 70% of the Company's revenue, with over 90% of VITAS' revenue consisting of payments from Medicare and Medicaid programs.  Chemed's ability to grow, therefore, was closely tied to VITAS' ability to increase reimbursements from federal Medicare and Medicaid programs.

5.     The Individual Defendants also personally benefitted from their breaches of fiduciary duties.  During the Relevant Period, the materially false and misleading statements, which the Individual Defendants caused the Company to issue, artificially inflated Chemed's

stock price.  Defendants took advantage of the artificially inflated Chemed stock price in two ways:  (a) the Officer Defendants sold over $14.4 million of Chemed shares at inflated prices; and (b) they reaped additional rewards from the Company's Executive Long Term Incentive Plan, designed to reward executives for improving the Company's financial performance, but used here to improperly reward Defendants for their misconduct.

## JURISDICTION AND VENUE

6.     Jurisdiction is conferred by 28 U.S.C. § 1332.   There is complete diversity between Plaintiff and defendants.  And the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because (a) Chemed maintains its principal executive offices in this district; (b) one or more of the Defendants reside in this district; (c) a substantial portion of the transactions and wrongs complained of herein — including the Individual Defendants' primary participation in the wrongful acts — occurred in this district; and (d) Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## THE PARTIES

8.     Plaintiff Mildred A. North is a current shareholder of Chemed and has continuously owned Chemed stock at all relevant times.  Plaintiff is a citizen of Illinois.

9.     Nominal Defendant Chemed Corporation is a Delaware corporation with its principal place of business located at 2600 Chemed Center, 255 East 5th Street, Cincinnati, OH 45202.  Chemed's stock is listed and traded on the NYSE under the ticker "CHE."  Chemed is a citizen of Delaware and Ohio.

10.     Defendant Kevin J. McNamara was President and Chief Executive Officer ("CEO") of Chemed during the Relevant Period and has held these positions since August 1994

and May 2001, respectively. McNamara has been a director of Chemed at all relevant times. He is also Chairman of the company's VITAS Healthcare Corporation subsidiary. McNamara began his career at Chemed in 1980 as a corporate attorney. In 1981, he moved to Omnicare, Inc. (NYSE: OCR), Chemed's then 24%-owned affiliate, as Secretary. In 1986, McNamara returned to Chemed and was named Vice President, General Counsel, and Secretary. From 1990 through 1992, he also served as Executive Vice President and Chief Operating Officer of Omnicare. In 1992, McNamara was elected Vice Chairman of Chemed, while still serving as its General Counsel and Secretary. In 1993, he was named Executive Vice President, Secretary, and General Counsel of Chemed. The Board of Directors elected McNamara to his present position of President in 1994 and to the additional post of Chief Executive Officer in 2001. In February 2004, he also became Chairman of the company's VITAS subsidiary. McNamara holds an A.B. degree in economics from Denison University and a J.D. from Cornell Law School. McNamara is a citizen of Ohio.

11.     Defendant David Williams was Executive Vice President ("EVP") and Chief Financial Officer ("CFO") of Chemed during the Relevant Period and has held these positions since August 10, 2007 and March 5, 2004, respectively. Williams is a citizen of Ohio.

12.     Defendant Timothy O'Toole was CEO of the VITAS segment of Chemed and an EVP of Chemed during the Relevant Period and has held this position since February 24, 2004. During the Relevant Period, O'Toole was also an EVP of Chemed and has held this position since May 1992. Previously, from May 1992 to February 24, 2004, he also served as Chemed's Treasurer. O'Toole is a citizen of Ohio.

13.     Defendants McNamara, Williams, and O'Toole are sometimes collectively referred to herein as the "Officer Defendants."

14.     Defendant Joel F. Gemunder is and has been at all relevant times (from 1977 to the present) a director of Chemed, in addition to being a member of the Board's Nominating Committee. He previously served, until 2010, as President and Chief Executive Officer of Omnicare Inc., Covington, Kentucky. Omnicare is a former equity investor in Chemed. Gemunder is also a director of Ultratech, Inc. Gemunder is a citizen of Kentucky.

15.     Defendant Patrick B. Grace is a director of Chemed and has been at all relevant times since 1996, in addition to being a member of the Board's Audit Committee and Nominating Committee (the latter of which he is currently Chairman). Grace formerly served in various executive positions at W.R. Grace & Co. from 1977 to 1995, most recently as President & CEO of Grace Logistics, Inc. Since 2008 he has served as Chairman of the Board of KickStart International. He also currently serves as a director of Tonix Pharmaceuticals, Inc. Since 1996, he has been President of MLP Capital, Inc. Grace served as the Chief Operating and Financial Officer of C3 Communications, Inc., San Francisco, California, a unit of Level 3 Communications from December 1997 to January 31, 1999. Grace earned an M.B.A. from Columbia University. Grace is a citizen of New York.

16.     Defendant Walter L. Krebs is a director of Chemed and has been at all relevant times since 2005, in addition to being a member of the Board's Compensation Committee. He also previously served as a director of the Company from May 1989 to April 1991 and from May 1995 to May 2003. Krebs previously served as Senior Vice President-Finance, Chief Financial Officer and Treasurer of Service America Systems, Inc. (home and service warranties), a then-wholly owned subsidiary of the Company ("Service America") which Chemed sold in 2005. He retired from that position in July 1999, after having held it for over two years. Previously, he was a Director-Financial Services of DiverseyLever, Inc. (formerly

known as Diversey Corporation), Detroit, Michigan (specialty chemicals), from April 1991 to April 1996. From January 1990 to April 1991, he was Senior Vice President and the Chief Financial Officer of the Company's then-wholly owned subsidiary, DuBois Chemicals, Inc. (specialty chemicals). Krebs is a citizen of Ohio.

17.    Defendant Andrea R. Lindell is a director of Chemed and has been at all relevant times since May 2008, in addition to being a member of the Board's Compensation Committee. Ms. Lindell previously served as Dean and a Professor of the College of Nursing at the University of Cincinnati. She retired from these positions in January 2011 having held them since December 1990. She also currently serves as a director of Omnicare. Lindell is a citizen of Ohio.

18.    Defendant Thomas P. Rice is a director of Chemed and has been at all relevant times since May 2009, in addition to being a member of the Board's Audit Committee. Rice previously served as Chief Executive Officer of Andrx Corporation, Fort Lauderdale, Florida (specialty pharmaceuticals) ("Andrx"), from February 2004 to November 2006, when Andrx was sold to Watson Pharmaceuticals. Following the sale, Rice returned as General Manager and Partner to Columbia Investments LLC, Baltimore, Maryland, which invests in local businesses in Baltimore and which Rice co-founded in January 1996. He was also a Director of Par Pharmaceuticals, Woodcliff Lake, New Jersey (drug development, manufacture, and marketing) until November 2012. From January 1999 to March 2003, he was President and Chief Executive Officer of Chesapeake Biological Laboratories, Inc., Solomons, Maryland (pharmaceuticals manufacturing) ("Chesapeake"). Before co-founding Columbia Investments LLC, Rice served as Executive Vice President and Chief Operating Officer of Circa Pharmaceuticals, Inc., Copiague, New York (pharmaceuticals manufacturing) ("Circa"), from

June 1993 to January 1996.  Rice was also the Chief Financial Officer of Circa from June 1993 to January 1995. Prior to joining Circa, Rice spent seven years as an accountant with Deloitte & Touche LLP, an international accounting firm. He earned a Master's degree in finance from Loyola University.  He was a director of Circa from June 1993 to January 1996, a director of Chesapeake from January 1997 to January 1999 and a director of Andrx from April 2003 to November 2006.  Rice is a citizen of Maryland.

19.     Defendant Donald E. Saunders is a director of Chemed and has been at all relevant times since May 1998, in addition to being the Chairman of the Board's Audit Committee.   Saunders also previously served as a director of Chemed from May 1981 to May 1982, and from May 1983 to May 1987.  Saunders previously served as a Professor at the Farmer School of Business, Miami University, Oxford, Ohio.  He has held this position since August 2001.  He earned a doctorate in Economics, with a minor in Accounting, from Indiana University.  According to Chemed's Proxy Statement, Saunders has taken Masters level courses in financial reporting, financial valuation, and risk management. Saunders retired as President of DuBois, then a division of Diversey, in October 2000, having held that position since November 1993.  Saunders is a citizen of Ohio.

20.     Defendant George J. Walsh III is a director of Chemed and has been at all relevant times since May 1995, in addition to being the Chairman of the Board's Compensation Committee and a member of the Nominating Committee.  Walsh previously served as a partner with the law firm of Thompson Hine LLP, New York, New York.  He has held this position since May 2002.  Walsh was previously a partner with the law firm of Gould & Wilkie LLP, New York, New York, and held this position since January 1979.  Gould & Wilkie merged with

Thompson Hine on May 1, 2002.  Walsh was elected the Chairman of the Board of Directors in March 2009.  Walsh is a citizen of New York.

21.     Defendant Frank E. Wood is a director of Chemed and has been at all relevant times since 2002, in addition to being a member of the Board's Compensation Committee. Wood previously served as President and Chief Executive Officer of Secret Communications, LLC, Cincinnati, Ohio (former owner and operator of radio stations, and now a venture capital fund). He is also co-founder and principal of The Darwin Group, Cincinnati, Ohio (venture capital firm specializing in second-stage investments), and has held this position since 1998. Since 2000, he has also served as chairman of 8e6 Technologies Corporation, Orange, California (developer of Internet filtering software).  He is also a director of Tribune Company, Chicago, Illinois.  He earned a J.D. degree from The University of Chicago Law School.  Wood is a citizen of Ohio.

22.     Defendant Thomas C. Hutton is a director of Chemed and has been at all relevant times since 1985.  Hutton has served as a Vice President of the Company since February 1988. Hutton, who has a J.D. and Master's of Public Administration degree from Cornell University, practiced corporate law in New York concentrating in securities and regulatory law from 1977 to 1987.  He served as a director of Omnicare from May 1983 to May 2001.  Currently, Hutton serves as a trustee on three private foundations including the Chemed Foundation.  Hutton is a citizen of Ohio.

23.     Defendants Gemunder, Grace, Krebs, Lindell, Rice, Saunders, Walsh, Wood, Hutton, and McNamara are sometimes referred to herein as the "Director Defendants."  The Officer Defendants and the Director Defendants are sometimes collectively referred to as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE DEFENDANTS

24.     By reason of their positions as officers, directors and/or fiduciaries of Chemed and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe Chemed and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Chemed in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25.     Each director and officer of the Company owes to Chemed and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.     To discharge their duties, the officers and directors of Chemed were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Chemed were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

(d)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

27.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Chemed, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of Chemed's Board at all relevant times.

28.     At times relevant hereto, defendants were the agents of each of the other defendants and were at all times acting within the course and scope of such agency.

**CONTROL, ACCESS, AND AUTHORITY**

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly,

exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Chemed.

30.     Because of their advisory, executive, managerial, and directorial positions with Chemed, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Chemed, including information regarding the student admissions rate and future growth rate.

31.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

## REASONABLE AND PRUDENT SUPERVISION

32.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and internal controls of the Company.  By virtue of such duties, the officers and directors of Chemed were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)     remain informed as to how Chemed conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that Chemed was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to Chemed and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Chemed.

34.     The Individual Defendants each breached their duty of loyalty and good faith by causing the Company to make false and/or misleading statements and/or to fail to disclose: (a) the Company overstated its growth prospects by submitting unlawful requests for reimbursement to Medicare and Medicaid; (b) the Company's financial results were overstated because of its failure to comply with federal and state laws; (c) the Company failed to maintain

adequate systems of internal operational and financial controls; and (d) the Individual Defendants lacked a basis for their false statements about the Company's compliance with Medicare and Medicaid rules and regulations and about the Company's prospects and growth. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of (i) class action lawsuits that allege violations of the federal securities laws; and (ii) False Claims Act lawsuits filed by the Department of Justice. As a result, Chemed has expended, and will continue to expend, significant sums of money to rectify the Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (a) the Company overstated its growth prospects by engaging in illegal and improper recruiting activities, which also artificially inflated the Company's reported results and future growth prospects; (b) the Company's financial results were overstated because the Company submitted false and unlawful claims to the federal government for reimbursement of health care costs under the Medicare and Medicaid program; (c) the Company failed to maintain adequate systems of internal operational and financial controls; and (d) the Individual Defendants lacked a basis for their positive statements about the Company's prospects and growth. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein and benefitted themselves financially by selling

Chemed stock at inflated prices and/or receiving incentive-based compensation which was tied to Chemed's financial results.

37.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue false financial results.

38.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (b) disguise and misrepresent the Company's future business prospects; and (c) benefit themselves financially in an unjust and unlawful manner.

39.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

**A.     The Director Defendants Owed Fiduciary Duties and Assumed a Critical Role With Respect to Ensuring Compliance With Federal Law, Including Medicare and Medicaid**

41.     Chemed is a publicly-traded company.  Its directors are elected by stockholders and obligated to act in the best interests of such stockholders, not further their own interests. Chemed's Corporate Governance Principles state: "The board of directors is elected by the shareholders to oversee management and to assure that the long-term interests of the shareholders are being served."

42.     Chemed's Corporate Governance Principles also state that the Board is responsible for:

(a)     selecting, evaluating and compensating the CEO and overseeing CEO succession planning;

(b)     *providing counsel and oversight* on the selection, evaluation, development and compensation *of senior management*;

(c)     *reviewing, monitoring and, where appropriate, approving fundamental financial and business strategies and major corporate actions*;

(d)     *assessing major risks facing the company – and reviewing options for their mitigation*; and

(e)     *ensuring processes are in place for maintaining the integrity of the company – the integrity of the financial statements, the integrity of compliance with law and ethics, the integrity of relationships with customers and suppliers, and the integrity of relationships with other shareholders*.

**B.    The Individual Defendants Caused Chemed's VITAS Unit to Unlawfully Enroll
Ineligible Hospice Patients and to Unlawfully Obtain Payments From the Federal
Government**

   **(1)    The Company and Its Core Business – VITAS**

43.    Chemed Corporation was incorporated in Delaware in 1970 as a subsidiary of

W.R. Grace & Co. and succeeded to the business of W.R. Grace & Co.'s Special Products

Group as of April 30, 1971 and remained a subsidiary of W.R. Grace & Co. until March 10,

1982.

44.    During the Relevant Period, Chemed operated in two segments, VITAS and

Roto-Rooter.  Vitas Healthcare Corporation provides hospice and palliative care services to its

patients through a network of physicians, registered nurses, home health aides, social workers,

clergy and volunteers. Roto-Rooter provides plumbing and drain cleaning services to both

residential and commercial customers.

45.    This action concerns the VITAS hospice segment of Chemed's business which,

during the Relevant Period, accounted for more than 70% of the Company's revenue and a

similar percentage of the Company's after-tax profit.  In the larger VITAS segment, more than

90% of the segment's revenue was generated from Medicare and Medicaid reimbursements,

which were made on a "per diem" basis.

   **(2)    The Medicare Hospice Benefit**

46.    The Medicare Hospice Benefit ("MHB") covers palliative and support services

for terminally ill beneficiaries.  To be eligible for hospice care, a physician must certify that the

patient is "terminally ill."  42 U.S.C. § 1395f(a)(7).  An individual is considered terminally ill if

he or she has "a medical prognosis that the individual's life expectancy is 6 months or less."  42

U.S.C. § 1395x(dd)(3).

47.     The services covered under MHB include, among others, nursing care; physical, occupational or speech therapy; medical social services; home health aide and homemaker services; physician services; counseling; short-term inpatient care; drugs and biologicals for symptom control; home medical equipment; bereavement services; and other services for palliation of the terminal condition.  42 U.S.C. § 1395x(dd)(1).

48.     Beneficiaries who elect the MHB agree to forgo Medicare coverage for treatment of their terminal illness.  Once admitted to a hospice program, a written plan of care is established and maintained by an attending physician, medical director or another hospice physician.  42 U.S.C. § 1395f(a)(7)(B).

**(3)     Medicare Eligibility for Hospice Services**

49.     Once a beneficiary elects hospice services, a hospice physician and the patient's attending physician must certify that the beneficiary has a life expectancy of six months or less if the terminal illness runs its normal course.  42 U.S.C. § 1395f(a)(7)(A).

50.     If a patient is admitted into hospice care and survives for 90 days, the patient is reassessed.  If the terminally ill beneficiary continues to have a life expectancy of six months or less, the patient can be recertified for another 90 days.  *Id.*  Following the second 90 day period, as long as the patient remains eligible for MHB, the patient can be recertified for an unlimited number of 60 day benefit periods.  42 U.S.C. § 1395d(a)(4).  For recertification, only the hospice physician must certify that the beneficiary's life expectancy is six months or less.  42 U.S.C. § 1395f(a)(7)(A).

51.     All certifications and re-certifications must include a brief physician narrative explaining the clinical basis for the patient's prognosis.  42 U.S.C. § 418.22(b)(3).

52.     In addition to the requirements covering the eligibility of Medicare beneficiaries for hospice care benefits, there are also federal regulations governing the hospice program itself.

To that end, a hospice program must satisfy certain Conditions of Participation ("COP") to be certified and to receive Medicare payment for the services it provides.

53. One such COP requires the hospice to obtain the "informed consent" of the hospice patient, or the patient's legal representative, specifying the type of care services that will be provided. Admitting a hospice patient, even for a short time, without the patient's informed consent violates the COP.

54. In addition, to satisfy the COP requirement, a written plan of care for the patient must be established and developed prior to the administration of any care by an interdisciplinary team, which includes the patient's attending physician and the medical director at the hospice. The plan must assess the patient's needs, identify services to be provided to meet those needs, and must be reviewed and updated at specified intervals.

55. The COP requirements also mandate that hospice care employees receive ongoing training in the provision of hospice care services.

**(4)    Medicare Payment for Hospice Care**

56. Medicare pays hospice providers a daily rate for each day a beneficiary is enrolled in hospice care. Accordingly, the longer a patient is enrolled in hospice, the more revenue the hospice provider generates.

57. Payments are made according to a fee schedule that has base payment amounts for four categories of care: (a) routine home care; (b) continuous home care; (c) inpatient respite care; and (d) general inpatient care. In fiscal year 2010, the routine home care rate was $143 per day. The routine home care rate is paid for each day that a patient is enrolled in a hospice program and does not receive any of the other types of hospice care. For continuous home care (home care provided during periods of patient crisis), the hospice is paid an hourly rate ($34.75 per hour in 2010) for care delivered during periods of crisis if care is provided in the home for 8

or more hours within a 24-hour period.  The rate for inpatient respite care – short period inpatient care to provide respite for a primary caregiver – was $148 per day in 2010, and $636 per day for general inpatient care to treat symptoms that cannot be managed in another setting.

    **(5)**    **The Need to Avoid the Medicare Cap Penalty Created Pressure to Increase Admissions**

58.    The "Medicare cap" limits the total aggregate payment an individual hospice can receive in a year and is calculated by multiplying the number of beneficiaries who have elected hospice care during an accounting year by a per beneficiary "cap amount."  It was crucial for the Company not to exceed the Medicare cap limit because the Company would then have to record a liability and reimburse Medicare for the difference at the end of that year.

59.    Prior to the Relevant Period, VITAS suffered a significant decline in hospice admissions.  Indeed, between the third quarter of 2008 to the second quarter of 2009, VITAS experienced four consecutive quarters of negative hospice admissions growth.  The decline was due, in part, to competition from other hospice providers and weak industry trends.

60.    Negative admissions growth is reflected in the Company's financial statements in the form of slower revenue growth and lower earnings.  Negative admissions growth may cause a hospice provider to exceed the Medicare cap limit.  To avoid these outcomes, Defendants made material changes to VITAS' business model to increase hospice admissions.  Unbeknownst to investors, however, these changes involved the improper admission and recertification of hospice patients and the institution of billing practices designed to violate Medicare's rules and regulations.

    **(6)**    **Hospice Providers Become Subject to Heightened Scrutiny**

61.     Medicare spending on hospice rose 70% from 2005 through 2009.  As a result, the government began to more closely examine hospice providers for compliance with Medicare.

62.     In June 2008 and March 2009, the Medicare Payment Advisory Commission ("MedPAC") analyzed the hospice benefit and found that Medicare's hospice payment system contains incentives that make very long stays in hospice more profitable for providers than short stays, which may lead to inappropriate utilization of the benefit among some hospices. MedPAC also found that the Center for Medicare and Medicaid Services ("CMS") lacks adequate administrative and other controls to check the incentives for long stays in hospice or ensure providers' compliance with the benefit's eligibility criteria.   In particular, MedPAC found: (a) an increase in the number of hospices, driven almost entirely by growth in for-profit providers; (b) an increase in average length of stay due to increased lengths of stay among patients with the longest stays; (c) a positive correlation between hospice profit margins and average length of stay; (d) reports that some hospices admit patients who do not meet the Medicare hospice eligibility criteria of a life expectancy of six months or less; and (e) efforts by hospices to enroll nursing home residents and reports of questionable relationships between some nursing facilities and hospices.

63.     In addition, the Office of the Inspector General ("OIG") of the U.S. Department of Health and Human Services became increasingly involved in investigating hospice care providers and their compliance with Medicare and Medicaid regulations.  On or about July 18, 2011, the OIG published a report titled "Medicare Hospices That Focus on Nursing Facility Residents," detailing concerns with the provision of hospice care for nursing facility residents, including inappropriate enrollment and claims for compensation submitted to Medicare.  The

OIG found that these hospices seek out patients with conditions that typically require longer stays and less complex care.  The report noted the OIG's intent to look at marketing practices of these hospices and their relationships with nursing facilities.  Neither Chemed nor VITAS were specifically mentioned in this report.

> (7)  **The VITAS Hospice Program**

64.  VITAS provides hospice services primarily in patients' homes, but also provides services in inpatient hospice units, hospitals, nursing homes and assisted living communities/residential care facilities for the elderly.  VITAS contracts with several health care providers and practitioners, including physicians, hospitals and nursing homes and arranges for these entities to provide services to VITAS patients.

65.  VITAS is one of the country's largest providers of hospice care services.  During the Relevant Period, it was headquartered in Miami and served patients through Medicare-certified hospice programs in 16 states: California, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Kansas, Michigan, Missouri, New Jersey, Ohio, Pennsylvania, Texas, Virginia and Wisconsin.  VITAS' largest markets were Florida and California.

66.  Patients are referred to VITAS by physicians, hospitals, long-term care facilities and other institutional health care providers.  Some of these referral sources have contracts with VITAS to provide services to VITAS patients.

67.  Marketing personnel employed by VITAS are responsible for securing the referral of patients for hospice admissions and receive bonuses based on the number of patients who they refer *and who enroll* for hospice care.  Marketers forward a patient's name and information to a VITAS admissions nurse.  The admissions nurse examines the patient to determine the patient's eligibility for hospice care under the relevant Medicare and Medicaid

rules and regulations. The admitting nurse relates his or her findings to a VITAS physician, who, most often based solely upon the evaluation and determination of an admitting nurse, decides if he should certify that patient as "terminally ill" and, therefore, qualified for hospice care.

68. VITAS keeps track of its potential patient referrals using an internal reporting system called Salesforce. The sales data and referral reports on Salesforce are monitored daily by VITAS' corporate office.

69. During the Relevant Period, VITAS' corporate officers monitored the most important elements of VITAS' business, including admissions, discharge rate and median length of patient stay. VITAS' former Senior Director of Compliance[1] reported that a "census" specifically monitoring hospice admissions was generated at the corporate level and updated daily. The census was created for upper management, including managers and directors, and allowed them to track the performance of VITAS' business. According to VITAS' former Senior Director of Compliance, VITAS directors were always looking at admissions numbers and had access to the census via computer log-in. The census also included "budget" numbers that VITAS was required to achieve monthly, as well as length of patient stay. Defendant O'Toole regularly discussed numbers contained in the census with VITAS' CFO.

70. As the Company admitted in its annual reports for the years ended December 31, 2009 and December 31, 2010, filed with the SEC on Form 10-K, Defendants "actively monitor[ed] each of [their] hospice programs, by provider number, as to their specific

_____

[1] Such individual was identified as confidential witness #2 in the securities fraud class action complaint filed against Chemed – *In re Chemed Corp. Sec. Litig.*, Case No. 12-cv-0028-MRB (S.D. Ohio). *See* Dkt. No. 47-3; Proposed Second Amended Complaint ¶¶ 35(b), 61.

admissions, discharge rate and median length of stay data in an attempt to determine whether they are likely to exceed the Medicare cap."

71.     Along with VITAS' management, "Chemed management regularly corresponded with Vitas management about the average daily census and growth in admissions, making focused, frequent inquiries if they believed the numbers reported were too low."   DOJ Complaint ¶ 161.

72.     Moreover, as Chemed has stated in its annual Proxy Statements filed with the SEC, Chemed management maintained during the Relevant Time Period a formal Enterprise Risk Management (ERM) program that monitors management's actions in response to the key risks facing the Company.   The Audit Committee (Defendants Rice, Saunders and Grace) reviews the ERM program periodically during the year.   It oversees Chemed's risk identification and mitigation process.   It reviews material financial risk exposures including regulatory matters involving VITAS.   Members of Chemed management, including the Chief Legal Officer, VITAS Compliance Officer, the Director of Internal Audit, and Defendants McNamara, Williams and O'Toole regularly report to the Audit Committee throughout the year regarding ERM program and any material risks to the Company.   During the Relevant Period, the Audit Committee also reviewed legal matters that posed a significant risk to Chemed, including the DOJ and OIG investigations and lawsuits detailed herein.

73.     As alleged *infra*, the Individual Defendants, acting together and in concert, engaged in an extensive, company-wide scheme to: (i) enroll and keep patients in hospice even though those individuals were not eligible for hospice care; (ii) enroll and keep patients in the more expensive continuous care level of service, including those who were not eligible for this "crisis care"; and (iii) obtain payments for these hospice services from the federal government

in violation of Medicare and Medicaid rules and regulations.  A material portion of Chemed's revenues, earnings and hospice enrollments in the VITAS segment were inflated during the Relevant Period due to these and other unlawful practices.

### (8) Defendants Violated Medicare Rules and Regulations Throughout the Relevant Period

74.     In an attempt to reverse VITAS' declining admissions growth, the Officer Defendants caused the Company to admit patients who were not eligible for hospice care and billed Medicare for their services to such patients.  Indeed, following a lengthy investigation, the DOJ concluded: "Vitas's corporate culture encouraged its marketing and clinical staff to admit as many patients as possible, regardless of whether they were eligible for hospice."  DOJ Complaint ¶ 164.

75.     While Medicare rules and regulations require a physician to certify a patient for admission to hospice care, at VITAS, that certification was wholly dependent upon the evaluation of the only person who met with the patient prior to admission, the admitting nurse.  Thus, by exerting pressure on its admitting nurses to ratify the admission of non-terminally ill patients (¶¶81-101, *infra*), VITAS enabled physicians to ultimately certify the admission of ineligible patients.

### (9) VITAS Failed to Properly Train and Teach Employees the Requirements for Medicare Coverage

76.     Given the importance VITAS had to Chemed's overall success and the significance of the revenues received directly from Medicare, the Individual Defendants had a duty to obtain a thorough understanding of the Medicare hospice program.  Inherent in that duty was the Company's obligation to properly train and inform its employees regarding the requirements for Medicare coverage of hospice services.  DOJ Complaint ¶ 31.

77.     As the DOJ observed, VITAS did not properly train its staff on hospice eligibility criteria.  A former VITAS medical director stated that he received no training at all from VITAS on Medicare eligibility requirements for hospice.  VITAS expected this former medical director to certify patients as eligible for hospice without first determining that the patient had a prognosis of six months or less to live should the patient's illness run its normal course.  In contrast, numerous VITAS marketing employees informed the DOJ that VITAS spent a significant amount of resources training its marketing employees on how to "sell hospice" to patients, patients' families, and referral sources for potential hospice patients.  DOJ Complaint ¶ 169.

78.     VITAS employed field nurses to provide care to its hospice patients residing in skilled nursing facilities, assisted living facilities, and hospitals, but did not adequately teach the nurses of the eligibility requirements for Medicare eligibility.  DOJ Complaint ¶ 170.

79.     VITAS directed these untrained field nurses, as part of their roles and responsibilities, to identify elderly people who were eligible for the Medicare hospice benefit, and to encourage the referral of elderly people to VITAS for end of life care.  DOJ Complaint ¶ 171.

80.     The allegations of inadequate and improper training alleged by the DOJ were corroborated by detailed allegations from confidential witnesses in the securities fraud class action complaint,[2] who stated that there were inconsistencies in admissions at multiple VITAS locations due to a lack of training of staff to identify hospice-appropriate patients, which led to the admission of inappropriate patients.

_____

[2] *See infra* note 3.

**(10) VITAS Pressures Admission Nurses to Admit Non-Terminally Ill Patients**

81.     As detailed by numerous former VITAS employees who worked at the Company during the Relevant Period, there was immense pressure at VITAS to routinely admit as many patients to hospice as possible, regardless of their eligibility.  VITAS put pressure on admission nurses because nurses were typically the ones who evaluated the patient for hospice eligibility.  Admission nurses would present their findings to doctors who would rely on the nurses' assessment in making a determination as to whether to admit a patient to hospice.

82.     The DOJ Complaint describes reports of "Medical staff … that . . . felt pressured by Vitas to admit or readmit patients who were inappropriate for hospice services.  One former Vitas admissions nurse said that if he did not admit a patient he believed to be ineligible, he would be pressured to reconsider his decision until he finally determined the patient was eligible for the Medicare hospice benefit.  The same nurse stated that he was pressured by Vitas to bend the Medicare rules to get patients onto hospice service."  DOJ Complaint ¶ 173.

83.     The DOJ Complaint alleges that "According to one former hospice manager for Vitas, the company philosophy was to sign everybody up for Medicare hospice services.  A former Vitas nurse in Florida said that Vitas wanted everyone enrolled in hospice care.  This philosophy is inconsistent with Medicare requirements, because, for example, a patient who elects hospice care under the Medicare program also chooses to stop receiving curative care for his or her illness."  DOJ Complaint ¶ 172.[3]

--------------------------------

[3] In addition to the specific factual allegations of the DOJ complaint, the Proposed Second Amended Complaint in *In re Chemed Corp. Sec. Litig.*, Case No. 12-cv-0028-MRB (S.D. Ohio), alleges specific facts about former VITAS employees who corroborated the scheme at Chemed and VITAS to charge Medicare unlawfully for hospice care by wrongfully admitting non-terminally ill patients.   *See* Proposed Second Amended Complaint ¶¶ 72-88.

84. The DOJ Complaint also details how nurses were coerced into falsifying information. A "Vitas nurse stated that she was instructed by Vitas to falsely write that a patient experienced symptoms that the patient did not experience in order to support a determination of hospice eligibility. For example, she was once told to write that a patient had an unnatural color, or pallor, when the patient did not, and was instructed not to write that the patient's health was improving in the medical record." DOJ Complaint ¶ 175.

85. The DOJ Complaint confirms that this pressure was coming from "top-level management" at Chemed and VITAS. "Top-level managers at Vitas's corporate headquarters set aggressive hospice admissions goals for regional and mid-level corporate managers at local Vitas programs, resulting in the admission of ineligible patients. Chemed management regularly corresponded with Vitas management about the average daily census and growth in admissions, making focused frequent inquiries if they believed the numbers reported were too low. Vitas senior managers regularly corresponded with personnel in the field offices when their average daily census and admissions growth were lagging." DOJ Complaint ¶¶ 160-62.

86. Thus, VITAS management regularly corresponded with the Officer Defendants named herein about hospice admissions and revenue, and the Officer Defendants and other executives at Chemed put pressure on VITAS management to increase revenues from the hospice care at VITAS if they thought the numbers were too low. The Officer Defendants, as well as Members of Chemed management, including the Chief Legal Officer, VITAS Compliance Officer, the Director of Internal Audit, and Defendants McNamara, Williams and O'Toole regularly reported to the Audit Committee throughout the year regarding any material risks to the Company. The reports from the VITAS Compliance Officer would

obviously specifically entail detailed reports concerning VITAS' compliance (or lack thereof) with Medicare rules and regulations.

87.     The Audit Committee Defendants (Rice, Saunders and Grace) thus had actual knowledge of these key adverse facts during the Relevant Period.  The Audit Committee Defendants, in turn, provided reports to the full Board at the regular Board meetings concerning these issues, thus apprising the other Director Defendants of such facts. In 2010, the Board met nine (9) times.  In 2011, the Board met five (5) times.  In 2012, the Board met seven (7) times.

88.     The wrongdoing at VITAS also extended beyond the admission of patients who did not qualify for hospice care.  VITAS also pressured its employees to recertify patients for hospice care even when they no longer qualified.

89.     As set forth in the DOJ Complaint: "[a]nother Vitas nurse stated that when she attended the weekly meetings to discuss discharging patients, the goal was to discharge as few patients as possible without regard to hospice appropriateness.  Discharging more than four patients per meeting was frowned upon by the Vitas business managers, and Vitas medical staff were told to stop discharging patients even if patients were not eligible."  DOJ Complaint ¶ 174.

**(11)     VITAS Pressures Marketers to Push for Inappropriate Admissions**

90.     In addition to the pressure placed by VITAS on admitting nurses to admit ineligible patients, pressure was also placed on other VITAS employees. Among those pressured and incentivized to admit patients into VITAS' hospice care programs were general managers and their sales and marketing staffs.  As the DOJ observed, "[g]eneral managers, who were typically not nurses or doctors, expected their marketing departments and sales representatives to find referral sources and patients, and evaluated and promoted their employees based on meeting hospice admissions goals.  This often meant that the Vitas

program managers disregarded concerns of nurses and doctors who expressed that they did not believe that certain Vitas hospice patients were terminally ill." DOJ Complaint ¶ 166. These general managers were directly evaluated based on the number of patients admitted at the program facility and the profitability of those patients. *Id*. at ¶ 165.

91.     Severe pressure was placed on VITAS' marketing personnel by general managers to improperly admit patients into hospice care in the form of monthly and quarterly quotas that came from the top level of the Company. An individual identified as CW14 in the securities fraud class action complaint described Senior Vice President of Market Development and Sales, Donald Gaddy (who reported directly to Defendant O'Toole), as "running the show" and believed that he most likely generated monthly and quarterly quotas.[4]

92.     VITAS' quota system created incentives for marketing personnel to not only generate referrals for VITAS, but to also ensure that those referrals turned into actual patients. The DOJ Complaint supports these allegations, asserting that "[o]ne former general manager stated that Vitas paid him bonuses based on the number of patient admissions and the length of time he could get a patient to stay on hospice services." DOJ Complaint ¶¶ 167-68.

---

[4] *See In re Chemed Corp. Sec. Litig.*, Case No. 12-cv-0028-MRB (S.D. Ohio), Proposed Second Amended Complaint ¶ 94. The Proposed Second Amended Complaint in *In re Chemed Corp. Sec. Litig.*, Case No. 12-cv-0028-MRB (S.D. Ohio), also contains specific factual allegations that an individual identified as CW4 confirmed this, stating that the push on quotas was coming from Gaddy, and that Regional Director of Marketing, Kim Lowerman, received the quotas from Gaddy and then sent them out to the marketers. According to another individual identified as CW1, the quotas were set by Defendant O'Toole. It was CW1's understanding that Gaddy and Executive Vice President Peggy Pettit (who reported directly to O'Toole) were also involved in setting the quotas. *Id.*

93.     The DOJ complaint also alleges that: "Vitas took adverse employment actions against marketing representatives who did not meet monthly admissions goals."  DOJ Complaint ¶ 168.

94.     Former VITAS employees have alleged that marketers would harass families until they obtained approval to place a patient into hospice care, and that marketers would pressure nurses and, as a result of this pressure, that nurses would draft orders transferring patients onto hospice and pressure doctors to sign the orders.  Doctors would sign-off on orders to stop being pressured by nurses.

95.     Although VITAS' marketing personnel were not supposed to play a role in the admissions decision-making process, VITAS' marketing personnel often became involved in the admissions process and would speak with patients' families to persuade them to use VITAS' hospice care services.

96.     The DOJ Complaint states "Chemed and VITAS set aggressive sales goals for the number of crisis care days that it wanted Vitas to bill to Medicare, and was directly involved in making decisions about how Vitas would market its crisis care services. As a result, Chemed and Vitas set aggressive goals for Vitas's salespeople and other staff to find beneficiaries for whom they could bill Medicare for crisis care, and Vitas billed Medicare excessively for crisis care."  DOJ Complaint ¶¶ 65-66. Aggressive marketing tactics were endorsed by Chemed and VITAS, which "expected their employees to increase the number of crisis care claims submitted to Medicare, without regard to whether the crisis care services were appropriate for patients, or whether Vitas was actually providing the crisis care services to patients when it billed Medicare for those services." *Id.* at ¶ 57.

**(12)    VITAS' Pressure on Nurses and Marketers Results in Inappropriate Admissions to Hospice**

97.      Chemed and VITAS' plan worked.  The intense pressure placed on admission nurses to evaluate patients and find them eligible for hospice care, and on marketers to push admitting nurses and doctors to admit the patients they referred, resulted in the widespread inappropriate admissions of patients for both hospice care and continuous home care.  The increase in admissions numbers reflect both the pressure placed on admitting nurses and marketers, and the success of that pressure.  Former employees throughout the country confirmed with specificity the percentage of patients admitted to VITAS' hospice care who did not qualify under Medicare's rules and regulations.

98.      According to a former VITAS employee, at least 50% of admitted patients in VITAS' Dublin, Ohio facility did not qualify for hospice care.  The former employee[5] alleges to have personally conducted an audit of patient lists and charts during the Relevant Period to verify patient eligibility and found that documentation was not satisfactory.  The employee reported the improper admission of patients to general manager (Steve Wishart), to the Regional Nursing Supervisor, and directly to the Vice President of Operations, Joanne Mack.  Joanne Mack reported to Karen Peterson, the Chief Nursing Officer.  Peterson, in turn, reported directly to Defendant O'Toole.

99.      The former VITAS employee recalled a specific instance where he was told to admit a patient who was unconscious and unable to consent to hospice services.  When he/she refused, the general manager notified Joanne Mack, who authorized the admission.  The former

---

[5] Identified as CW3 in *In re Chemed Corp. Sec. Litig.*, Case No. 12-cv-0028-MRB (S.D. Ohio), Proposed Second Amended Complaint.

employee eventually resigned his/her position with VITAS because of the improper admission of ineligible patients at the Dublin, Ohio facility and sent a letter directly to Tim O'Toole and Karen Peterson (the Chief Nursing Officer, who reports to O'Toole), at VITAS' corporate office detailing all the admissions issues that he observed.  The former employee[6] knew that the corporate office received the letter because a VITAS attorney, a corporate representative and Karen Peterson contacted him/her about the letter and notified him/her that they would investigate his/her allegations.  They conceded that the non-responsive patient admitted by Joanne Mack should not have been admitted.

100.    According to another former employee,[7] approximately 20% of the hospice patients in VITAS' Coachella Valley, California location were inappropriately admitted.

101.    The DOJ, which was empowered by different courts to conduct pre-suit discovery, identified several examples of *specific patients* who were inappropriately admitted to hospice care.  The DOJ Complaint states that Chemed and VITAS unlawfully billed Medicare for these patients, including patients who were improperly admitted for hospice care before, during and after the Relevant Period.  The following patients were inappropriately admitted into hospice care and VITAS improperly billed Medicare for these patients:

(a)    "MP" from Missouri – according to the DOJ, "Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for hospice care for Patient MP in Missouri from April 10, 2009 through February 3, 2010.  These claims were false or fraudulent because Vitas's medical records for MP show that

_____

[6] Again, identified as CW3 in *In re Chemed Corp. Sec. Litig.*, Case No. 12-cv-0028-MRB (S.D. Ohio), Proposed Second Amended Complaint.

[7] Identified as CW7 in *In re Chemed Corp. Sec. Litig.*, Case No. 12-cv-0028-MRB (S.D. Ohio), Proposed Second Amended Complaint.

MP did not have a terminal illness with a prognosis of six months or less if MP's disease ran its normal course.  According to Vitas's medical records, Vitas admitted MP to hospice based upon a diagnosis of debility, but MP did not meet the medical criteria for this diagnosis.  In addition, on April 10, 2009, the day MP was admitted to hospice, there was no indication that MP's pre- existing condition had deteriorated.  The medical records state that MP was alert and oriented to self, denied pain, and weighed 151 pounds, having only lost two pounds in the last one to two months.  Throughout the period that Medicare paid Vitas's claims on behalf of MP, Vitas's medical records show that MP remained stable and even gained weight, and her body mass index remained consistently above the level required by hospice eligibility criteria . . . Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of patient MP from April 10, 2009 through February 3, 2010, in the amount of $42,763.82; and Medicare paid the claims."  DOJ Complaint ¶¶ 187-90.

(b)  "MC" from California – as related by the DOJ, "Chemed and Vitas knowingly submitted or caused to be submitted false and fraudulent claims for hospice care on behalf of Patient MC in California, covering the period from July 18, 2009 through February 16, 2012.  These claims were false or fraudulent because Vitas's medical records for MC show that MC did not have a terminal illness with a prognosis of six months or less if MP's disease ran its normal course.  Vitas's medical records for MC also show that at each period of time when Vitas recertified that MC was eligible for hospice care, MC did not have a terminal illness with a prognosis of six months or less if MC's illness ran its normal course.  According to Vitas's medical records, Vitas admitted MC to hospice after a hospital stay, based upon a diagnosis of heart failure, but MC had

no symptoms to indicate MC had any end-stage disease or condition, including heart disease.  At the time of MC's admission to the hospital, MC was living independently and performing daily activities without assistance.  At around the time Vitas admitted MC to its hospice program, its medical notes for MC stated that MC was very healthy given her age.  In fact, Vitas stopped administering MC heart medications during her time in hospice.  During MC's hospice stay, the only medications that Vitas administered were for anxiety.  MC was walking and performing daily activities without assistance.  In March 2010, a doctor noted that MC did not need oxygen, unless she became excited.  Any shortness of breath was related to MC's anxiety, not heart disease.  In addition to improperly admitting MC for hospice care when she was not eligible, Chemed and Vitas also knowingly submitted or caused to be submitted false or fraudulent claims to Medicare on behalf of MC for crisis care.  On January 20, 2012, Vitas began billing Medicare for crisis care for MC due to caregiver teaching and breakdown, neither of which are bases to submit claims to Medicare for crisis care.  During the time that Vitas billed Medicare for crisis care for MC, Vitas's nursing notes state that MC was doing her own laundry.  Vitas stopped billing Medicare for crisis care on January 24, 2012 for unspecified reasons.  MC died on February 16, 2012, after being on hospice for approximately two and a half years.  Although MC died while receiving hospice, at no point during the time that Vitas billed Medicare for MC's hospice care did MC have a life expectancy of six months or less if a disease ran its normal course.  Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of Patient MC from July 18, 2009 through February 16, 2012, in the amount of approximately $169,820.99 and Medicare paid the claims."  DOJ Complaint ¶¶ 199-209.

(c)     "WB" from California – according to the DOJ Complaint, "Chemed and Vitas knowingly submitted or caused to be submitted false or fraudulent claims to Medicare for hospice care on behalf of Patient WB in California, covering the period from June 5, 2008 through March 18, 2011.  These claims were false or fraudulent because Vitas's medical records for WB show that WB did not have a terminal illness with a prognosis of six months or less if WB's illness ran its normal course.  Vitas's medical records for WB also show that at each period of time when Vitas recertified that WB was eligible for hospice care, WB did not have a terminal illness with a prognosis of six months or less if WB's illness ran its normal course.  According to Vitas's medical records, Vitas admitted WB to hospice based upon a diagnosis of cardiovascular disease, but there were no medical examination findings to support the conclusion that WB was in end-stage heart failure or had another end-stage cardiac condition, and Vitas did not accurately assess whether WB had a terminal illness with a prognosis of six months or less if WB's illness ran its normal course.  A patient with a cardiac disease can be terminal if the patient meets the criteria for Class IV on the New York Heart Association's system for classifying degrees of heart failure.  To be Class IV, a patient must be unable to carry out any physical activity without discomfort, have symptoms of cardiac insufficiency while at rest, and experience increased discomfort if the patient engages in any physical activity.  Vitas's records for WB show that he had no shortness of breath or other heart failure symptoms while at rest.  Additionally, Vitas gradually decreased the heart medications that WB received while he was on hospice care, finally ceasing all of WB's heart medicines on December 20, 2009.  Throughout his time on hospice, WB remained stable and was clearly not suffering from end-stage heart disease.  Vitas's medical records for

- 35 -

WB contained inconsistent and contradictory information, including inconsistent descriptions of WB's symptoms written by different members of Vitas staff as well as inaccurate functional scores noted by Vitas staff but contradicted by WB's documented symptoms.  For example, nursing notes in WB's medical files would state that WB had no shortness of breath, but a doctor who visited WB around the same time wrote that WB had intermittent shortness of breath.  Additionally, Vitas staff noted in WB's records that he was experiencing slow progressive decline and remain[ed] appropriate for hospice with prognosis of 6 [months] or less, Vitas's records for WB lack any documentation of decline in WB's nutritional or functional status, or other factors that would indicate that WB had a prognosis of six months or less if his disease ran its normal course.  After remaining stable while he received hospice care for almost three years, WB was ultimately discharged from hospice on March 2, 2011 for extended prognosis.  Chemed and Vitas knowingly submitted or caused the submission of false or fraudulent claims to Medicare for hospice care on behalf of Patient WB from June 5, 2008 through March 18, 2011, in the amount of $170,666.02; and Medicare paid the claims."  DOJ Complaint ¶¶ 191-98.

**(13)     VITAS Inappropriately Admits Patients to Continuous Care**

102.    The DOJ Complaint cites instances of abuse of continuous or "crisis" care billing. "Vitas marketed crisis care services to patients and their families as intensive comfort care services, without mentioning that in order to bill Medicare for these services at the higher rates, a patient had to be experiencing a short-term crisis and have acute medical symptoms. One of Vitas's marketing brochures states that 'intensive comfort care' is available for 'symptoms causing distress to the patient or family.'  Vitas knowingly misled patients and their families to believe that the Medicare hospice benefit would routinely cover around-the-clock care for hospice patients, absent the requisite acute medical symptoms resulting in brief periods

of crisis that must be present for crisis care to be covered by Medicare. Because of this marketing ploy, patients sometimes chose Vitas over other providers, although the Medicare benefit is the same for patients regardless of the hospice program they choose. Vitas used similarly misleading techniques when it marketed its hospice services to potential referral sources of future hospice patients, such as physicians, nursing homes, and hospitals." DOJ Complaint ¶¶ 58-59.

103. Detailed allegations from the DOJ Complaint demonstrate that Chemed and VITAS inappropriately admitted patients to continuous care and illegally billed Medicare for these inappropriate admissions during the Relevant Period. DOJ Complaint ¶¶ 9, 54, 186. For example, the DOJ Complaint describes how VITAS billed Medicare for "patient MG" in California for unnecessary crisis care during the time period from February 19, 2010 through March 8, 2010. "According to its medical records, Vitas billed Medicare for crisis care for MG beginning on February 25, 2010, and ending on March 8, 2010, for the stated reason of seizures. However, Vitas's records do not indicate that MG suffered seizures during this time period. MG was not otherwise in crisis during this time period. Vitas should not have billed Medicare for crisis care when routine home care was appropriate. Chemed and Vitas knowingly submitted or caused the submission of false or improper claims to Medicare for crisis care services to Patient MG that were not necessary or not provided for the time period February 25, 2010 through March 8, 2010, in the amount of approximately $5,000; and Medicare paid the claims." DOJ Complaint ¶¶ 151-53.

**(14)     Defendants Knowingly Violated Medicare Billing Practices**

104. Defendants' knowledge of VITAS' illicit admission of patients into hospice care who did not qualify, provision of continuous care services to patients whose condition did not so warrant, and manipulated billing practices is clear. As alleged herein, Defendants actively

managed VITAS' business, overseeing and monitoring VITAS' productivity, admissions levels, discharge rate and length of patient stays.

105.    Moreover, Defendant O'Toole not only imposed unreasonable census goals, but knew that the results he received from the various hospice facilities were inflated with inappropriate admissions.   In light of their intimate involvement with VITAS' activities, Defendants knew that VITAS' patient admission, patient retention, continuous care offerings and billing practices violated applicable Medicare regulations and resulted in the Company materially overstating its revenues based on hospice services rendered to ineligible patients.

106.    The DOJ Complaint provides additional evidence that Defendants knew that patients were being inappropriately admitted to hospice care for continuous or crisis care.  Since at least 2007, Chemed and VITAS conducted regular internal audits or program reviews. "Through these internal audits, Chemed and Vitas were made aware of patients (1) who were receiving crisis care services, but did not qualify for such services, (2) for whom services were billed to Medicare as crisis care services, but the services were inconsistent with the patients' medical plans of care or with Medicare requirements, (3) for whom Vitas's own medical records showed were not in crisis."  DOJ Complaint ¶¶ 68-69.

107.    The DOJ Complaint references an internal Company document written during the Relevant Period, in September 2010, entitled, "Patient Care Documentation and Compliance Internal Review" for the San Fernando, California VITAS hospice program, showing that VITAS reviewed crisis care medical records for this hospice program.  "Only 50 percent of the records showed that Vitas was being consistent with Medicare's criteria for crisis care.  Only 10 percent of the crisis care claims comported with the patients' plans of care set forth by Vitas medical teams.  After reviewing multiple factors, the audit team gave the crisis care claims in

this location a 69 percent score, indicating a significant deficiency in compliance with Medicare requirements." DOJ Complaint ¶ 70.

108.    The DOJ Complaint reports that "Chemed and Vitas were also aware that their Medicare billings for crisis care were excessive as compared to other hospices, yet their billings to Medicare did not decrease." DOJ Complaint ¶ 71. The National Hospice and Palliative Care Organization (NHPCO) releases annual reports regarding hospice operations. Based on their historical data, "Vitas obtains Medicare reimbursement for crisis care far exceeding that of the rest of the hospice industry...Vitas bills Medicare for twice as many crisis care days as all other hospice providers combined." DOJ Complaint ¶ 72.

109.    When comparing the NHPCO reports to Chemed and VITAS' financial reports throughout the Relevant Period, "Vitas's crisis care billings are almost six times what would be expected if its crisis care figures were in line with the national average." DOJ Complaint ¶¶ 72-76.

### (15)    Defendants Emphasize VITAS' Revenue Growth and Compliance with Medicare

110.    Despite VITAS' improper patient enrollment and billing practices, throughout the Relevant Period Defendants repeatedly emphasized VITAS' revenue growth and compliance with Medicare rules and regulations.

111.    During the Relevant Period, the Individual Defendants approved Chemed's financial statements which reported consistent and increasing profits for the VITAS segment, with net revenues of $217.6 million in the fourth quarter of 2009, $222.9 million in the first quarter of 2010, $226.6 million in the second quarter of 2010, $234.0 million in the third quarter of 2010, $242 million in the fourth quarter of 2010, $236 million in the first quarter of 2011, $243 million in the second quarter of 2011 and $253 million in the third quarter of 2011.

Defendants repeated and elaborated upon VITAS' positive financial performance in SEC filings, press releases and conference calls with analysts.

112. Defendants attributed VITAS' revenue increases, in part, to "increased ADC [average daily census] and admissions." Throughout the Relevant Period, the Individual Defendants cited what appeared to be legitimate explanations for VITAS' admissions growth, stating, among other things, that VITAS has "placed significant emphasis on increasing admissions," "generated some extremely positive improvements in [its] overall admission trends" and that it was now able to achieve "better responses from [its] admissions areas to get to people very quickly, and appropriately discuss the hospice option with them." Rather than disclose the true reason behind VITAS' increase in hospice admissions growth (*i.e.*, the fact that the Company was improperly admitting patients who were not eligible for hospice care), Defendants attributed the increase in admissions growth to "the expansion of our inpatient units" and "investments in our field personnel, in terms of staffing, training and support."

113. Throughout the Relevant Period, the Individual Defendants also insisted that Chemed's billing practices were appropriate and in compliance with Medicare rules and regulations. They repeatedly drafted, authorized, and/or signed SEC filings which stated: "[w]e believe our hospice programs comply with all payor requirements at the time of billing" and "[w]e believe that we are in material compliance with Medicare and Medicaid rules and regulations applicable to hospice providers."

**(16) Investigations of VITAS Alert Defendants to Abuses at the Company**

114. Since at least April 2005, as demonstrated below, the United States government has been investigating the Company for an alleged failure to appropriately bill Medicare and Medicaid for the hospice services provided by VITAS. Thus, the Individual Defendants have

had actual knowledge since at least April 2005 of the government's allegations concerning improper billing by VITAS.

115.    As the Company admits, "the VITAS segment of the Company's business operates in a heavily-regulated industry. As a result, the Company is subjected to inquiries and investigations by various government agencies, as well as to lawsuits, including *qui tam* actions." *See* Form 10-Q filed with the SEC on July 25, 2013 at 19.  Thus, Chemed's directors had actual knowledge during the Relevant Period that the Company's VITAS segment, whose revenues are highly material to the Company's earnings, is scrutinized by the government for compliance issues, and that failure to ensure VITAS' compliance with federal laws and regulations could jeopardize and have a material adverse impact on the Company's revenues and profits.

116.    On May 2, 2013, the government filed a False Claims Act complaint against the Company and certain of its hospice-related subsidiaries in the Western District of Missouri, captioned as *United States of America v. VITAS Hospice Services, LLC, et al.*, Case #4:13-cv-00449-BCW.   The complaint alleges that, since at least 2002, Vitas, and since 2004, the Company, submitted or caused the submission of false claims to the Medicare program by (a) billing Medicare for crisis care services when the patients were not eligible, the services were not provided, or the medical care was inappropriate, and (b) admitting patients who were not eligible for the Medicare hospice benefit because they did not have a life expectancy of six months or less if their illnesses ran their normal course.  The complaint seeks treble damages, statutory penalties, and the costs of the action, plus interest.

117.    Moreover, in April 2005, VITAS had received a subpoena from the OIG requesting that VITAS produce various categories of documents from 1998 through the date of

the subpoena in connection with an investigation into an alleged failure to appropriately bill Medicare and Medicaid for hospice services. The requested categories of documents included patient medical and billing records for 320 past and then current patients from VITAS' three largest programs; policy and procedure manuals; information concerning patient admissions, certifications, discharges, and lengths of stay; and census information. In the third quarter of 2005, the OIG requested additional information from Chemed.

118.    In May 2006, VITAS received another subpoena from OIG seeking certain information concerning employees and their compensation from 1999 through 2004.

119.    In 2004, two former VITAS employees filed a related *qui tam* suit in the U.S. District Court for the Southern District of Florida, *United States, et al. ex rel. Barys v. Vitas Healthcare Corp.*, 1:04-cv-21431. The complaint asserted violations of the federal False Claims Act against VITAS and certain of its affiliates, based on the alleged fraudulent admissions and recertification of ineligible patients. In July 2007, the district court dismissed the suit with prejudice. The U.S. Court of Appeals for the Eleventh Circuit affirmed the dismissal in November 2008.  In March 2009, VITAS received a letter from the Department of Justice indicating that its investigation of VITAS' Florida programs was ongoing.

120.    In July 2012, VITAS received an investigative subpoena from the Florida Attorney General seeking documents previously produced in the course of prior OIG government investigations as well as, for the period January 1, 2007 through the date of production, billing records and procedures; information concerning business results, plans, and strategies; documents concerning patient eligibility for hospice care; and certain information concerning employees and their compensation.

121.    In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting that VITAS deliver to the OIG various categories of documents for its headquarters and Texas programs from January 1, 2003 through the date of the subpoena. The requested categories included policy and procedure manuals and information concerning Medicare and Medicaid billing and the provision of hospice services; patient medical records; information concerning business plans, strategies, and results and VITAS' affiliated entities and referral sources; and certain information concerning employees and their compensation.

122.    In August 2009, the OIG selected medical records regarding 59 past and current patients from a Texas program for review.

123.    In September 2010, VITAS received a second administrative subpoena from the Department of Justice seeking electronic documents of 10 current and former employees.

124.    In April 2011, the U.S. Attorney provided the Company with a copy of a *qui tam* complaint filed under seal in the U.S. District Court for the Northern District of Texas, *United States, et al. ex rel. Rehfeldt v. Vitas Healthcare Corp.*, 3:09-cv-0203 ("*Rehfeldt*").    In November 2011, the complaint was unsealed.    The U.S. Attorney and the Attorney General for the State of Texas filed notices in November 2011 stating that they had decided not to intervene in the case at that time but indicating that they would continue to investigate the allegations. The complaint asserts violations of the federal False Claims Act and the Texas Medicaid Fraud Prevention Act based on the alleged admission and re-certification of ineligible patients, conspiracy to admit ineligible patients, and backdating patient revocations. The suit was brought by Michael Rehfeldt, a former general manager of VITAS's San Antonio program, against VITAS, the San Antonio program's former Regional Vice-President, Keith Becker, and

former Medical Director, Justo Cisneros, and their respective then-current employers: Wellmed Medical Management, Care Level Management, LLC, Inspiris Hospice, LLC, and Inspiris, Inc.

125.    In February 2010, VITAS received a companion civil investigative demand ("CID") from the Texas Attorney General seeking documents from January 1, 2002 through the date of the CID, and interrogatory responses in connection with a related investigation of possible fraudulent submission of Medicaid claims for non-qualifying patients and fraudulent shifting of costs from VITAS to the State of Texas and the United States. The CID requested similar information sought by the Department of Justice's May 2009 administrative subpoena, together with information concerning record-keeping and retention practices, and medical records concerning 117 patients.  In September 2010, VITAS received a second CID from the Texas Attorney General seeking additional documents concerning business plans and results, revocation forms for certain patients, and electronic documents of 10 current and former employees.

126.    In June 2011, the U.S. Attorney provided the Company with a partially unsealed *qui tam* complaint filed under seal in the U.S. District Court for the Western District of Texas, *United States, et al. ex rel. Urick v. Vitas HME Solutions, Inc. et al.,* 5:08-cv-0663 ("*Urick*"). The U.S. Attorney filed a notice in May 2012 stating that it had decided not to intervene in the case at that time but indicating that it continues to investigate the allegations.  In June 2012, the complaint was unsealed.  The complaint asserts violations of the federal False Claims Act and the Texas Medicaid Fraud Prevention Act based on allegations of a conspiracy to submit to Medicare and Medicaid false claims involving hospice services for ineligible patients, unnecessary medical supplies, failing to satisfy certain prerequisites for payment, and altering patient records, including backdating patient revocations. The suit was brought by Barbara

Urick, a registered nurse in VITAS' San Antonio program, against VITAS, certain of its affiliates, and several former VITAS employees, including physicians Justo Cisneros and Antonio Cavasos and nurses Sally Schwenk, Diane Anest, and Edith Reed.  In September 2012, the plaintiff dismissed all claims against the individual defendants. The complaint was served on the VITAS entities on April 12, 2013.

127.    Also in June 2011, the U.S. Attorney provided the Company with a partially unsealed *qui tam* complaint filed under seal in the U.S. District Court for the Northern District of Illinois, *United States, et al. ex rel. Spottiswood v. Chemed Corp.,* 1:07-cv-4566 ("*Spottiswood*").  In April 2012, the complaint was unsealed.  The U.S. Attorney and Attorney General for the State of Illinois filed notices in April and May 2012, respectively, stating that they had decided not to intervene in the case at that time but indicating that they would continue to investigate the allegations.  Plaintiff filed an amended complaint in November 2012.  The complaint asserts violations of the federal False Claims Act and the Illinois Whistleblower Reward and Protection Act based on allegations that VITAS fraudulently billed Medicare and Medicaid for providing unwarranted continuous care services. The suit was brought by Laura Spottiswood, a former part-time pool registered nurse at VITAS, against Chemed, VITAS, and a VITAS affiliate.  The complaint was served on the defendants on April 12, 2013.  On May 29 and June 4, 2013, respectively, the Court granted the government's motion to partially intervene in *Spottiswood* and in *Urick* on the allegations that Vitas submitted or caused to be submitted false or fraudulent claims for continuous care and routine home care on behalf of certain ineligible Medicare beneficiaries. The Court also transferred them to the U.S. District Court for the Western District of Missouri under docket Nos. 4:13-cv-505 and 4:13-cv-563, respectively.

The government has told Vitas it intends to consolidate these cases with the 2013 Action described below.

128.    In June 2012, VITAS received an administrative subpoena from OIG in connection with an investigation of possible improper claims submitted to the Medicare and Medicaid programs. It seeks production of various categories of documents concerning the provision of hospice services, for headquarters and its Southern California programs, for the period January 1, 2007 through the date of the subpoena. The categories of documents include policy, procedure and training manuals; documents concerning patient eligibility for hospice care, including referrals, admissions, certifications, revocations and census information; documents concerning claims submitted to government programs; certain information concerning employees and their compensation; and documents concerning VITAS' financial performance. In August 2012, the OIG also subpoenaed medical records for 268 patients from three Southern California programs.

129.    In September 2012, VITAS received an administrative subpoena from OIG seeking production of medical records for 102 patients in 10 states who received continuous care between 2004 and 2009.  In December 2012, it received a second such administrative subpoena from the OIG seeking medical records for 103 patients who received continuous care between 2009 and 2012.

130.    On May 2, 2013, the government filed a False Claims Act complaint against the Company and certain of its hospice-related subsidiaries in the U.S. District Court for the Western District of Missouri, *United States v. VITAS Hospice Services, LLC*, *et al.,* 4:13-cv-00449-BCW (the "*2013 Action*").  The *2013 Action* alleges that, since at least 2002, VITAS, and since 2004, the Company, submitted or caused the submission of false claims to the

Medicare program by (a) billing Medicare for continuous home care services when the patients were not eligible, the services were not provided, or the medical care was inappropriate, and (b) billing Medicare for patients who were not eligible for the Medicare hospice benefit because they did not have a life expectancy of six months or less if their illnesses ran their normal course.  This complaint seeks treble damages, statutory penalties, and the costs of the action, plus interest.

131.    On May 6, 2013, the U.S. District Court for the Western District of Missouri, at the request of the government, unsealed a *qui tam* complaint against VITAS and VITAS Healthcare Corporation of California, *United States ex rel. Charles Gonzales v. Vitas Healthcare Corporation, et al.,* CV 12-0761-R ("*Gonzales*"). The case was transferred from the Central District of California to the Western District of Missouri under docket No. 4:13-cv-344. The government has filed a notice of election to intervene in the *Gonzales* complaint.  The *Gonzales* complaint alleges that VITAS' Los Angeles program falsely certified and recertified patients as eligible for the Medicare Hospice Benefit.  It alleges violations of the False Claims Act and seeks treble damages, civil penalties, recovery of costs, attorneys' fees and expenses, and pre- and post-judgment interest.  In its notice of election to intervene in *Gonzales*, the government stated that it intends to seek to consolidate the *2013 Action* with *Gonzales* as a related matter. Upon consolidation, the government stated that the complaint in the *2013 Action* will supersede the *Gonzales* complaint.

132.    Chemed has already incurred damages in the amount of millions of dollars by having to defend itself against the government's allegations regarding VITAS' improper billing of Medicaid and Medicare for hospice services.  Through the first six months of 2013 alone, Chemed was forced to spend $2.0 million in legal and other expenses relating to such

investigations.  Such expenses and fees continue to increase, and Chemed is currently exposed to huge potential damages and judgments in such actions.  Significantly, the government's False Claims Act cause of action exposes Chemed to ***treble damages***, ***which are obligatory and must be awarded by the court should the government prevail at trial on the False Claims Act cause of action.***

133.    And, as the Company admitted in its Form 10-Q filed July 25, 2013: "Regardless of the outcome of any of the preceding matters, responding to the subpoenas and dealing with the various regulatory agencies can adversely affect us through defense costs, diversion of management time, and related publicity."

**C.    The Individual Defendants Cause Chemed to Make Materially False and Misleading Statements During the Relevant Period**

**(1)    February 15, 2010 and February 16, 2010 Statements Regarding 4Q09 and FY09 Results**

134.    On February 15, 2010, Chemed issued a press release announcing its financial results for the fourth quarter of 2009 and for fiscal year 2009, the period ended December 31, 2009.  For the quarter, the Company reported revenues of $303.2 million and net income of $17.99 million.  For the year, the Company reported revenues of $1.19 billion and net income of $73.78 million.  In the VITAS segment, the Company reported net revenues of $217.6 million, net income of $19.4 million, and patient admissions of 13,677 for the quarter.  For the year, the Company reported VITAS revenues of $854.3 million and net income of $72.16 million.  The press release described the reasons for revenue growth in VITAS, stating, in pertinent part, as follows:

> Net revenue for VITAS was $217.6 million in the fourth quarter of 2009, which is an increase of 5.7% over the prior year period.  ***This revenue growth was the result of increased ADC [average daily census] and admissions of 2.7% and Medicare price increases of approximately 3.5%.***

Average revenue per patient per day in the quarter, before the effect of the Medicare Cap, was $196.28, which is 3.6% above the prior-year period. Routine home care reimbursement and high acuity care averaged $154.74 and $678.94, respectively, per patient per day in the fourth quarter of 2009. During the quarter, high acuity days-of-care were 7.9% of total days-of-care. This compares to high acuity days of care of 7.8% in the prior-year quarter.

135. The following day, on February 16, 2010, Chemed held a conference call for analysts and investors to discuss the Company's earnings release and operations. Defendants McNamara, Williams and O'Toole participated in the conference call and spoke positively about the Company's businesses and prospects. Defendant McNamara made the following statements regarding VITAS' hospice admissions:

In the fourth quarter of 2009, our admissions totaled 13,677, an increase of 2.7% over the prior-year quarter. Admissions growth has been challenging in 2009. However, *through a combination of increased resources and significant effort by our field-based personnel, we have begun to positively impact our admissions trends. These efforts have generated a 2.9% admissions growth in the second half of 2009.* In the fourth quarter of 2009, VITAS recorded a reduction in revenue due to an estimated Medicare cap limitation of $1.8 million. The amount recorded relates predominantly to one program, which is our largest provider number. Admissions for this provider were strong during the quarter. However, revenue increased at a more rapid pace during the quarter due to a decrease in overall discharges and a mix shift to higher acuity days of care. The full-year gross margin for the program, including the Medicare cap limitation, was approximately 28%.

Defendant O'Toole also discussed the increase in hospice admissions growth at VITAS, stating, in pertinent part, as follows:

Over the past year *we have placed significant emphasis on increasing admissions. We have begun to see a return for these efforts, with admissions totaling 13,677 in the quarter, an increase of 2.7%. Our largest market, Florida, increased admissions 4.4% in the quarter, and our second largest state presence, California, expanded admissions 3.5%. We were able to expand admissions in ten of our 16 states, and the District of Columbia*.

＊　　　＊　　　＊

*Admissions have increased in three of our four top referral categories. During the fourth quarter home-based admissions increased 1.1%, assisted care living facilities increased 7.8% and hospital-referred admissions increased 6.2%.*

Nursing home referrals declined 6.6% in the quarter. We have also increased our investment in the admissions arena. Today we have 298 sales representative 119 admissions coordinators and 305 admission nurses. VITAS has increased our total admissions staffing personnel 9.2% when compared to the fourth quarter of 2008. These investments in the sales and admissions areas resulted in an increase of our total admissions cost of $1.4 million, or 9.6% when compared to the prior-year quarter.

136. When an analyst asked about the Company's strategy for growing patient admissions in the VITAS segment during the February 16, 2010 call, Defendant O'Toole engaged in the following exchange with the analyst:

Eric Gommel – Stifel Nicolaus – Analyst:

Okay. And then going to – you were talking about revamping your admissions sales and marketing strategy, I'm just curious, when you look at that do you see your strategy more as gaining market share from the existing operators in a market, or is it focusing on getting new patients or maybe growing the benefit on a base of patients that maybe haven't had access to it before, and ways you see as maybe the opportunity to further grow access to the benefits?

Defendant O'Toole:

Well, I think the answer to the question is we're trying to accomplish both of the areas you talked about. We're trying to maintain our market share in competitive markets. Some markets we have very high market share and we're trying to improve our sales effort, both from the professional individuals we hire, and how we train them and oversight them and the material we provide them, and certainly in certain programs where we have smaller market share, some of the new starts that are developed over the last two, three, four years, we're adding sales people, we're trying to grow our market share and we're accomplishing that. And yes, we are going to nonhistorical referral sources more frequently now, as we've developed opportunities to partner with home health companies, personal care companies, various sources out there that we have worked on over the last year, as we saw the hospital market and the nursing home market give us a little less opportunity and that'[s] working for us. So, again, just improving the overall selling, marketing effort, ***having the better responses from our admissions areas to get to people very quickly, and appropriately discuss the hospice option with them.*** So, again, we're just trying to improve on all fronts and I think we're making some progress in all of those areas.

137. The statements referenced above in ¶¶ 134-36 were materially false and misleading when made because, at the time they were made, Defendants knew (or were reckless

in not knowing), but failed to disclose, that: (a) a significant portion of VITAS' hospice admissions, average daily census, revenues and earnings were the direct result of Defendants' scheme to enroll, and keep enrolled, ineligible patients in hospice and improperly bill Medicare for inappropriate hospice services; (b) VITAS' reported average revenue per patient per day was materially inflated as a result of unnecessary continuous home care services provided to patients who did not require such services; (c) the Company failed to maintain adequate internal controls and procedures with respect to hospice admissions and Medicare billing; (d) the Company's financial results were materially inflated as a result of Defendants' scheme to enroll, and keep enrolled, ineligible patients in hospice; and, accordingly; and (e) Defendants lacked a reasonable basis for their positive statements about VITAS and its admissions growth. Moreover, the statements in ¶ 135 were materially false and misleading when made because VITAS' admissions trends were not merely due to "a combination of increased resources and significant effort by our field-based personnel," but rather, VITAS' Company-wide practice of admitting patients who were ineligible for hospice care because they were not terminally ill. In addition, the statements in ¶ 136 that VITAS was getting "better responses from our admissions areas to get to people very quickly, and appropriately discuss the hospice option with them" were materially false and misleading when made because VITAS' admissions team was routinely admitting patients that they knew were not eligible for hospice and VITAS' marketing personnel were inappropriately attempting to persuade the patients to use VITAS' services. Finally, any statement that VITAS' efforts to grow sales in established markets included the hiring *and training* of professional individuals, or any statement that the Company's success could be attributable in any way to VITAS' efforts to properly train its employees to comply

with Medicare rules and regulations, was misleading because VITAS' efforts to train its employees was completely inadequate.

> **(2)     February 26, 2010 Form 10-K for FY 2009**

138.    On February 26, 2010, Chemed filed its annual report for the year ended December 31, 2009 on Form 10-K ("2009 10-K"), which was signed by Defendants McNamara, Williams, Gemunder, Grace, Rice, Hutton, Krebs, Lindell, Wood, Saunders and Walsh, and reiterated the Company's financial results.  The 2009 10-K described Medicare's billing audits and claims review process, stating, in pertinent part, as follows:

> Billing Audits/Claims Reviews.  ***The Medicare program and its fiscal intermediaries and other payors periodically conduct pre-payment or post-payment reviews and other reviews and audits of health care claims, including hospice claims.***  There is pressure from state and federal governments and other payors to scrutinize health care claims to determine their validity and appropriateness.  In order to conduct these reviews, the payor requests documentation from Vitas and then reviews that documentation ***to determine compliance with applicable rules and regulations, including the eligibility of patients to receive hospice benefits***, the appropriateness of the care provided to those patients and the documentation of that care.  During the past several years, Vitas' claims have been subject to review and audit.  We make appropriate provisions in our accounting records to reduce our revenue for anticipated denial of payment related to these audits and reviews.  ***We believe our hospice programs comply with all payor requirements at the time of billing.***  However, we cannot predict whether future billing reviews or similar audits by payors will result in material denials or reductions in revenue.

139.    The 2009 10-K also discussed "Regulatory Matters," stating, in pertinent part, as follows:

> In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting VITAS deliver to the OIG documents, patient records, and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to the date of the letter.  In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review.  In February 2010, VITAS received a companion civil investigative demand from the state of Texas Attorney General's Office, seeking related documents.  Based on the early stage of the investigation and the limited information we have at this time, we cannot predict the outcome of this investigation.  ***We believe that we are in material compliance***

*with Medicare and Medicaid rules and regulations applicable to hospice providers.*

140.    The statements referenced above in ¶¶ 138-39 that VITAS' "hospice programs comply with all payor requirements at the time of billing" and "are in material compliance with Medicare and Medicaid rules and regulations" were materially false and misleading when made because, at the time they were made, Defendants were knowingly (or recklessly), violating Medicare and Medicaid rules and regulations by admitting patients who did not qualify for hospice care, re-certifying patients who were not qualified for hospice treatment under Medicare laws and guidelines and improperly billing the government for inappropriate services rendered to hospice patients.  The Director Defendants specifically reviewed, approved and signed the 2010 Annual Report, including its statements about Chemed's compliance with legal and regulatory matters.  Moreover, before signing the 2009 Form 10-K, the Audit Committee Defendants  (Defendants Rice, Saunders and Grace) specifically discussed with both the Company's management and outside auditors the financial statements contained in the annual report and the representations regarding the adequacy of Chemed's internal controls.  The Proxy Statement filed with the SEC on April 1, 2010 contained an "Audit Committee Report" which was signed by Defendants Rice, Saunders and Grace and stated:

"1. *The Audit Committee [Rice, Saunders and Grace] has reviewed and discussed the audited financial statements and management's report on internal control over financial reporting with the Company's management*."

"2. *The Audit Committee has discussed with the independent accountants the matters required to be discussed by SAS 61*."

"3. The Audit Committee has received the written disclosures and the letter from the independent accountants required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountants' communications with the Audit Committee concerning independence and has discussed with the independent accountants the independent accountants' independence.

- 53 -

"4.  Based on the review and discussion referred to in paragraphs (1) through (3) above, *the Audit Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2009, for filing with the SEC*."

(3)     **April 20, 2010 and April 21, 2010 Statements Regarding Q1 2010 Results**

141.    On April 20, 2010, Chemed issued a press release announcing its financial results for the first quarter of 2010, the period ended March 31, 2010.  For the quarter, the Company reported revenues of $308.8 million and net income of $19.36 million.  In the VITAS segment, the Company reported net revenues of $222.9 million, net income of $18.4 million, and patient admissions of 14,844 for the quarter.  The press release described the reasons for revenue growth in VITAS, stating, in pertinent part, as follows:

> *Net revenue for VITAS was $222.9 million in the first quarter of 2010*, which is an increase of 7.0% over the prior year period.  *This revenue growth was the result of increased ADC of 5.1%, driven by an increase in admissions of 4.8%, combined with Medicare price increases of approximately 1.3%.*

> *            *            *

> *The 4.8% admissions growth is attributed to the opening of six additional inpatient units (IPUs) over the past four quarters as well as a significant increase in staffing focused on referral sources and patient admissions.*  New IPUs provide increased visibility to referral sources in the community as well as increased capacity to provide hospice care to more high acuity terminally ill patients.

> *Average revenue per patient per day in the quarter*, excluding the impact of Medicare Cap and the 2008 retroactive price adjustment, *was $199.45*, which is 1.8% above the prior-year period.  Routine home care reimbursement and high acuity care averaged $154.95 and $678.17, respectively, per patient per day in the first quarter of 2010.  During the quarter, high acuity days of care were 8.5% of total days of care.  This compares to high acuity days of care of 8.4% in the prior-year quarter.

142.    The next day, on April 21, 2010, Chemed held a conference call for analysts and investors to discuss the Company's earnings release and operations.  Defendants McNamara,

- 54 -

Williams and O'Toole participated in the conference call.  Defendant McNamara made the

following statements regarding the growth in VITAS' hospice admissions:

> Admission growth had been challenging in 2009.   However, through a combination of strategic expansion of our inpatient units in key markets, and an increase in our field-base personnel, *we have positively impacted our admissions trends over the last three quarters.   These efforts have generated a 2.9% admissions growth in the second half of 2009, and a 4.8% increase in admissions in the first quarter of 2010.*

143.     Defendant O'Toole also discussed the increase in hospice admissions growth at

VITAS, stating, in pertinent part, as follows:

> Over the past year, we have placed significant emphasis on increasing admissions. I am also pleased to say that *we are reporting very positive results for these efforts, with admissions increasing 4.8% in the quarter to 14,844.  Our largest market, Florida, increased admissions, 6.4% in the quarter, and our second largest state presence, California, expanded admissions 4%.  We were able to expand admissions in 11 of our 15 states and the District of Columbia . . . I attribute a significant portion of this growth in admissions to our strategy of expanding our inpatient, high acuity care capacity.*  This strategy raises VITAS's visibility with our referral sources and key markets.  In addition, increased care to high acuity patients can have a very positive impact on our billing potential under the Medicare Cap formula.
>
> *                    *                    *
>
> *Admissions have increased in three of our four top referral categories.  During the first quarter, home-based admissions increased 6%, assisted care living facilities increased 25%, and hospital referred admissions increased 2.8%.* Nursing home referrals declined 0.4% in the quarter.

144.     During the call, when an analyst from Deutsche Bank asked about "the volume

strength" that the Company was experiencing in the VITAS segment, Defendant O'Toole

responded, in pertinent part, as follows:

> Yeah, I don't think – we tried to talk about *some of the trends over the last several quarters with us making enhanced efforts to non-traditional referral sources, and adding our strength at the sales level, as well as making sure we're very responsible on the admission nurse side*.  When there is a potential referral, to meet the needs immediately of the patient and their families, to bring them on, if that's their choice.  So, those are beginning to take hold.  The inpatient unit strategy with opening new beds brings in some very short-stay patients, which

helps the admission trend, and also over time gives you presence in the referring hospitals, so it builds your home care program as well.

Defendant McNamara added:

> And I would say, (inaudible) commentary, **we were very happy with the admission trend.  We were happy with the census that we held on to**, and if – there's another comment I would make with regard to labor management, which is so important. That remains very good during the quarter on the cost side.  Tim alluded to some costs on the administrative side.  Some things that were done intentionally.  Some of the administrative costs had come from a program of adding inpatient units and more doctors on staff.  All of that is intentional, but something we're watching, but I don't want to leave the subject without saying that we had another quarter of very good labor management, which is essential in the business.

145.     The statements referenced above in ¶¶141-44 were materially false and misleading when made for the reasons stated in ¶137.  In addition, the statements in ¶141 attributing VITAS' admissions growth to the opening of "additional inpatient units" and "significant increase in staffing" were materially false and misleading when made because Defendants failed to also disclose that VITAS' increase in hospice admissions was due in large part to the Company-wide practice of admitting patients who were ineligible for hospice care because they were not terminally ill.  Moreover, Defendants' statements in ¶144 that "we're very responsible on the admission nurse side" were materially false and misleading when made because, according to a number of former VITAS employees who worked at VITAS during the Relevant Period, the admission nurses routinely admitted patients to hospice, regardless of eligibility.

### (4)     April 30, 2010 1Q10 Form 10-Q

146.     On April 30, 2010, the Company filed its quarterly report for the first quarter of 2010 on Form 10-Q and reiterated the financial results reported on April 20, 2010.  The Form 10-Q was drafted, prepared, and/or approved by the Individual Defendants, and signed by

Defendants McNamara and Williams.  Additionally, the quarterly report discussed "Legal and Regulatory Matters" and stated, in pertinent part, as follows:

> In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting VITAS deliver to the OIG documents, patient records, and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to the date of the letter.  In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review.  In February 2010, VITAS received a companion civil investigative demand from the state of Texas Attorney General's Office, seeking related documents.  Based on the early stage of the investigation and the limited information we have at this time, we cannot predict the outcome of this investigation.  ***We believe that we are in material compliance with Medicare and Medicaid rules and regulations applicable to hospice providers.***

147.    The statements referenced above in ¶146 that VITAS is "in material compliance with Medicare and Medicaid rules and regulations" were materially false and misleading when made because, at the time they were made, Defendants knew or consciously ignored the fact that Chemed and VITAS were violating Medicare and Medicaid rules and regulations by admitting patients who did not qualify for hospice care, recertifying patients who were not qualified for hospice treatment under Medicare laws and guidelines and improperly billing the government for inappropriate services rendered to hospice patients.

###     (5)     July 28, 2010 and July 29, 2010 Statements Regarding 2Q10 Results

148.    On July 28, 2010, Chemed issued a press release announcing its financial results for the second quarter of 2010, the period ended June 30, 2010.  For the quarter, the Company reported revenues of $315 million and net income of $18.9 million.  In the VITAS segment, the Company reported net revenues of $226.6 million, net income of $18.3 million, and patient admissions of 14,423 for the quarter.  The press release described the reasons for revenue growth in VITAS, stating, in pertinent part, as follows:

> ***Net revenue for VITAS was $226.6 million in the second quarter of 2010***, which is an increase of 7.3% over the prior year period.  ***This revenue growth was the***

*result of increased ADC of 5.6%, driven by an increase in admissions of 4.2%, combined with Medicare price increases of approximately 1.3%. The remaining growth was driven by geographic mix shift of the patient base.*

The 4.2% admissions growth in the second quarter of 2010 compares favorably to the 0.8% decline in admissions in the prior-year quarter and a 0.7% decline in admissions for full-year 2009.

*Average revenue per patient per day in the quarter*, excluding the impact of Medicare Cap, *was $197.89*, which is 1.8% above the prior-year period. Routine home care reimbursement and high acuity care averaged $155.33 and $682.40, respectively, per patient per day in the second quarter of 2010. During the quarter, high acuity days of care were 8.1% of total days of care. This is essentially equal to the prior-year quarter.

149.    The next day, on July 29, 2010, Chemed held a conference call for analysts and investors to discuss the Company's earnings release and operations. Defendants McNamara, Williams and O'Toole participated in the conference call and spoke positively about the Company's businesses and prospects. Defendants made the following statements regarding the performance of the Company's VITAS segment:

Defendant McNamara:

In the second quarter of 2010, our hospice business segment generated revenue of $227 million, an increase of 7.3% over the comparable prior year period. VITAS provided an adjusted EBITDA of $33.1 million, an increase of 5.6% compared to the second quarter of 2009. This equated to an adjusted EBITDA margin of 14.6%. *Our admissions expanded 4.2% in the quarter and have increased 4.5% on a year-to-date basis.* This compares to a 4% decline in admissions in the first six months of 2009. *This improvement in admissions trend is attributable to* several factors. The most significant has been *the expansion of our inpatient units, or IPUs, over the past year.* As of June 30, 2010, VITAS has 31 dedicated IPUs with a total daily capacity of 414 beds. This is a 15% increase in IPU locations and 11% increase in patient beds. New IPUs provide increased visibility to the referral sources in the community as well as increased capacity to provide hospice care to our high acuity patients.

\*        \*        \*

*We have also made significant investments in our field personnel, in terms of staffing, training and support. These investments are now providing a noticeable improvement in our overall admissions trends.*

\*        \*        \*

- 58 -

<u>Defendant Williams</u>:

As Kevin noted, net revenue for VITAS was $227 million in the second quarter of 2010, which is an increase of 7.3% over the prior year period.  ***This revenue growth was a result of increased ADC of 5.6%, driven by an increase in admissions of 4.2% combined with Medicare price increases of approximately 1.3%.  The remaining growth was driven by a geographic mix shift in our patient base.***  The 4.2% admissions growth in the second quarter of 2010 compares favorably to the 0.8% decline in admissions in the prior year quarter and the 0.7% decline in admissions for a full year 2009.

*        *        *

<u>Defendant O'Toole</u>:

VITAS, as well as the hospice industry, experienced a reduction in admission trends during 2009.  ***To counter this trend, we made significant investments in our marketing, sales and admission personnel and developed specific market strategies to maximize VITAS' opportunity in all of our locations.  These efforts have begun to provide noticeable improvements in our admission trends.***

In the second quarter of 2010, VITAS admitted 14,423 patients, which is 4.2% higher than the prior year quarter.  And for the first six months of 2010, admissions increased at a 4.5% rate.  On a year-to-date basis, our largest state, Florida, increased admissions by 7.1%.  And our second largest state presence, California, expanded admissions by 1.7%.  Our most difficult states in 2009 were Illinois and Texas.  The admissions for both of these states have stabilized.  And in the first half of 2010, Illinois' admissions were effectively flat, and Texas declined just 1%.  ***This growth in admissions is in part due to our strategy of expanding inpatient capacity.***  This strategy raises VITAS' visibility with our referral sources in key markets.  In addition, increased care to high acuity patients has a very positive impact on our billing potential under the Medicare cap formula.

*        *        *

***Admissions have increased in three of our four top referral categories.  During the second quarter, home-based admissions increased 8.1%, assisted care living facilities increased 10.7%, and hospital-referred admissions increased 2.4%.***  Nursing home referrals declined less than 1% in the quarter.

150.    The statements referenced above in ¶¶148-49 were materially false and misleading when made for the reasons stated in ¶137.

**(6)    July 30, 2010 2Q10 Form 10-Q**

151.    On July 30, 2010, the Company filed its quarterly report for the second quarter of 2010 on Form 10-Q and reiterated the financial results reported on July 28, 2010.  The Form 10-Q was drafted, prepared, and/or approved by the Individual Defendants, and signed by Defendants McNamara and Williams.  Additionally, the quarterly report discussed "Legal and Regulatory Matters" and stated, in pertinent part, as follows:

> In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting VITAS deliver to the OIG documents, patient records, and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to the date of the letter.  In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review.  In February 2010, VITAS received a companion civil investigative demand from the state of Texas Attorney General's Office, seeking related documents.  Based on the early stage of the investigation and the limited information we have at this time, we cannot predict the outcome of this investigation.  ***We believe that we are in material compliance with Medicare and Medicaid rules and regulations applicable to hospice providers.***

152.    The statements referenced above in ¶151 that VITAS is "in material compliance with Medicare and Medicaid rules and regulations" were reviewed and approved by Defendants Grace, Rice and Saunders, who comprised the members of Chemed's Audit Committee at the time.  Grace, Rice and Saunders knew such statements were materially false and misleading when made because, at the time they were made, Defendants knew or consciously ignored the fact that Chemed and VITAS were violating Medicare and Medicaid rules and regulations by admitting patients who did not qualify for hospice care, recertifying patients who were not qualified for hospice treatment under Medicare laws and guidelines and improperly billing the government for inappropriate services rendered to hospice patients.

### (7)    October 25, 2010 and October 26, 2010 Statements Regarding 3Q10 Results

153.    On October 25, 2010, Chemed issued a press release announcing its financial results for the third quarter of 2010, the period ended September 30, 2010.  For the quarter, the

Company reported revenues of $320.5 million and net income of $21 million.  In the VITAS segment, the Company reported net revenues of $234 million, net income of $19.8 million, and patient admissions of 14,483 for the quarter.   The press release described the reasons for revenue growth in VITAS, stating, in pertinent part, as follows:

> **Net revenue for VITAS was $234.0 million in the third quarter of 2010**, which is an increase of 7.8% over the prior-year period.  **This revenue growth was the result of increased ADC of 6.1%, driven by an increase in admissions of 5.4%, combined with Medicare price increases of approximately 1.3%.  The remaining growth was driven by geographic mix shift of the patient base.**
> The 5.4% admissions growth in the third quarter of 2010 compares favorably to the 3.1% increase in admissions in the prior-year quarter and a 0.7% decline in admissions for full-year 2009.
>
> **Average revenue per patient per day in the quarter**, excluding the impact of Medicare Cap, **was $197.90**, which is 1.6% above the prior-year period.  Routine home care reimbursement and high acuity care averaged $155.49 and $689.30, respectively, per patient per day in the third quarter of 2010.  During the quarter, high acuity days of care were 7.9% of total days of care.  This is essentially equal to the prior-year quarter.

154.    The next day, on October 26, 2010, Chemed held a conference call for analysts and investors to discuss the Company's earnings release and operations.   Defendants McNamara, Williams and O'Toole participated in the conference call and made the following statements regarding the performance of the Company's VITAS segment:

Defendant McNamara:

> **Our admissions expanded 5.4% in the quarter and have increased 4.8% on a year-to-date basis.**  This compares to a 1.7% decline in admissions in the first nine months of 2009.  **This improvement in admissions trends is attributable to several factors, the most significant has been the expansion of our inpatient units, or IPUs, over the past year.**
>
> *        *        *
>
> **We've also made significant investments in our field personnel in terms of staffing, training, and support.   These investments are now providing a noticeable improvement in our overall admissions trends.**
>
> *        *        *

- 61 -

Defendant Williams:

As Kevin noted, the net revenue for VITAS was $234 million in the third quarter of 2010, which is an increase of 7.8% over the prior year period.  ***This revenue growth was a result of increased ADC of 6.1%, driven by an increase of admissions of 5.4%, increased discharges of 4.7%, combined with Medicare price increases of approximately 1.3%.  The remaining difference was driven by geographic mix shift of the patient base***.  Our average revenue per patient per day in the quarter, excluding the impact of Medicare Cap, was $197.90, which is 1.6% above the prior year period.

\*       \*       \*

Defendant O'Toole:

VITAS is continually monitoring and adjusting its local field efforts in terms of generating awareness of the hospice benefit for Medicare.  ***Through the hard work of all of our employees we have generated some extremely positive improvements in our overall admission trends.  This has resulted in VITAS admitting 14,483 patients in the quarter, which is 5.4% higher than the prior year***.

During the quarter our largest State, ***Florida, increased admissions 9.3%, and our second largest State presence, California, expanded admissions 4.1%.  We were able to expand admissions in 11 of the 15 States plus the District of Columbia, in which VITAS operates***.

\*       \*       \*

***Admissions have increased in three of our four top referral categories.  During the third quarter home based admissions increased 8.5%, assisted care living facilities admissions increased 5.6%, and hospital referred admissions increased 5.9%.***  Nursing home referrals declined 2.4% in the quarter.  ***This growth in admissions is in part due to our strategy of expanding inpatient capacity.***  This strategy raises VITAS' visibility with our referral sources in key markets.  In addition, increased care to high acuity patients has a positive impact on our billing potential under the Medicare Cap formula.

155.    During the call, when an analyst from Barclays asked how much of VITAS' admissions growth was attributed to Chemed's initiatives versus the growth in the hospice industry overall, Defendant O'Toole responded, in pertinent part, as follows:

Well, ***I'd like to attribute most of the impact from initiatives that we took***, you know, the economy is a minor issue, I don't want to overstate it.  So those are issues.  We continue to have a lot of resources coming to the table.  ***We're getting to the referrals sooner.  We're providing great care, and the inpatient unit***

- 62 -

*activity, the continuous care program, all of our marketing, we're – we have big market presence in many of our locations*.

As you know, our strategy is to go into large markets, which gives us continual opportunity to expand.  One of the ways we expand is by opening satellite offices, and we've done numerous of those during the year.  They're not considered new starts.  So, again, *all those initiatives I expect to continue, and as I say we're optimistic*.

156.     The statements referenced above in ¶¶ 153-55 were materially false and misleading when made for the reasons stated in ¶ 137.

**(8)     November 3, 2010 3Q10 Form 10-Q**

157.     On November 3, 2010, the Company filed its quarterly report for the third quarter of 2010 on Form 10-Q and reiterated the financial results reported on October 25, 2010. The Form 10-Q was drafted, prepared, and/or approved by the Individual Defendants, and signed by Defendants McNamara and Williams.  Additionally, the quarterly report discussed "Legal and Regulatory Matters" and stated, in pertinent part, as follows:

> In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting VITAS deliver to the OIG documents, patient records, and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to the date of the letter.  In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review.  In February 2010, VITAS received a companion civil investigative demand ("CID") from the state of Texas Attorney General's Office, seeking related documents.  In September 2010, it received a second CID and a second administrative subpoena seeking related documents.  Based on the early stage of the investigation and the limited information we have at this time, we cannot predict the outcome of this investigation. *We believe that we are in material compliance with Medicare and Medicaid rules and regulations applicable to hospice providers.*

158.     The statements referenced above that VITAS is "in material compliance with Medicare and Medicaid rules and regulations" were reviewed and approved by Defendants Grace, Rice and Saunders, who comprised the members of Chemed's Audit Committee at the time.  Grace, Rice and Saunders knew such statements were materially false and misleading

- 63 -

when made because, at the time they were made, Defendants Grace, Rice and Saunders, as well as the other Director Defendants, knew or consciously ignored the fact that Chemed and VITAS were violating Medicare and Medicaid rules and regulations by admitting patients who did not qualify for hospice care, recertifying patients who were not qualified for hospice treatment under Medicare laws and guidelines and improperly billing the government for inappropriate services rendered to hospice patients.

**(9)    February 15, 2011 and February 16, 2011 Statements Regarding 4Q10 and FY10 Results**

159.    On February 15, 2011, Chemed issued a press release announcing its financial results for the fourth quarter and year end of 2010, the period ended December 31, 2010.  For the quarter, the Company reported revenues of $336 million and net income of $22.6 million. For the year, the Company reported revenues of $1.28 billion and net income of $81.83 million. In the VITAS segment, the Company reported net revenues of $242 million, net income of $23.3 million, and patient admissions of 14,776 for the quarter.  For the year in VITAS, the Company reported revenues of $925.81 million and net income of $79.8 million.  The press release described the reasons for revenue growth in VITAS, stating, in pertinent part, as follows:

> *Net revenue for VITAS was $242 million in the fourth quarter of 2010*, which is an increase of 11.4% over the prior-year period.  Excluding the impact of Medicare Cap, revenue increased 10.9%.  *This revenue growth was the result of increased ADC of 7.7%, driven by an increase in admissions of 8.0%, combined with Medicare price increases of approximately 2.1%.  The remaining growth was driven by geographic mix shift of the patient base.*

> *Average revenue per patient per day in the quarter*, excluding the impact of Medicare Cap, *was $202.21*, which is 3.0% above the prior-year period.  Routine home care reimbursement and high acuity care averaged $159.31 and $701.21, respectively, per patient per day in the fourth quarter of 2010.  During the quarter, high acuity days of care were 7.9% of total days of care, essentially equal to the prior-year quarter.

160.    The next day, on February 16, 2011, Chemed held a conference call for analysts and investors to discuss the Company's earnings release and operations.   Defendants McNamara, Williams and O'Toole participated in the conference call.   Defendant McNamara made the following statements regarding the improvement in VITAS' admissions trends:

> In the fourth quarter of 2010 our admissions totaled 14,776, an increase of 8% over the prior-year quarter.  This brings our full-year 2010 admissions growth to 5.6%.  ***This improvement in admissions trends in 2010 is attributed to several factors. The most significant has been the expansion of our inpatient units, or IPUs, over the past year.***  As of December 31, 2010, VITAS now has 32 dedicated IPUs with a total daily capacity of 427 beds.  Over 75% of our inpatient days of care are within these dedicated units.  The remaining 25% of our high-acuity inpatient care is provided with short-term contract beds.
>
> *            *            *
>
> We have also made ***significant investments in our field personnel in terms of staffing, training, and support***.  These investments ***have provided a noticeable improvement in our overall admissions trends***.

Defendant O'Toole also commented on VITAS' admissions, stating, in pertinent part, as follows:

> Thank you, David.  As most of you are aware, ***we have put considerable efforts into our marketing and community education programs to increase admissions. Through the hard work of all of our employees, those who are directly responsible for developing referral sources and admitting patients and those providing excellent care, we have generated a total of 58,526 admissions in 2010***.  This is an increase of 5.6% over the prior year.  These admissions, coupled with our patient census at the start of the year, resulted in VITAS caring for over 70,000 patients in 2010.  I could not be more appreciative of all of the hard work from our employees during 2010, particularly our 200-plus hospice teams that deliver excellent care to the patients and families we serve.
>
> In the fourth quarter of 2010, we admitted 14,776 patients, which is 8% higher than the prior-year quarter.  During the quarter, our largest state, ***Florida, increased admissions 10.7%, and our second largest state presence, California, expanded admissions 7.6%.  We were able to expand admissions in 11 of the 15 states, plus the District of Columbia, in which VITAS operates.***  Our most difficult states in 2009 had been Illinois and Texas.  Both of these states have stabilized and in 2010, Illinois admissions declined 0.4%, and Texas increased 2.2%.  These results represent a significant improvement over the prior-year period.

> ***Admissions have increased in all four of our largest referral categories. During the fourth quarter, home-based admissions increased 7.4%, assisted care living facilities increased 18.9%, hospital-referred admissions increased 7.8%, and nursing home admissions increased 4%. This growth in admissions is in part due to our strategy of expanding inpatient capacity.*** This strategy raises VITAS' visibility with our referral sources in key markets. In addition, increased care to high-acuity patients has a very positive impact on our billing potential under the Medicare Cap formula.

161.    During the call, Frank Morgan, an analyst at RBC Capital Markets, asked about any ongoing Medicare billing audits or claims reviews. In response, Defendant O'Toole stated, in pertinent part, as follows:

> They're always continuing, whether they be at the federal level, or various state level reviews, and ***we're doing very well in that regard and have improved, as Dave just mentioned, our internal processes***. ***So we make sure we have all of the key documents in the file for those reviews and upgrading every aspect of our compliance program.***

162.    The statements referenced above in ¶¶ 159-61 were materially false and misleading when made for the reasons stated in ¶ 137. In addition, the statements referenced in ¶ 161 that VITAS was "upgrading every aspect of [its] compliance program" and making sure it had "all of the key documents in the file" for Medicare billing audits and claims reviews was materially false and misleading when made because patient eligibility for hospice services at VITAS was based on inaccurate and manipulated documentation. The Audit Committee Defendants had actual knowledge of this fact since they received regular reports on the subject from the VITAS Compliance Officer, and because they received regular and specific reports from Members of Chemed management, including the Chief Legal Officer, the VITAS Compliance Officer, the Director of Internal Audit, and Defendants McNamara, Williams, and O'Toole. Such individuals regularly report to the Audit Committee throughout the year regarding ERM program and any material risks to the Company. During the Relevant Period, the Audit Committee also reviewed legal matters that posed a significant risk to Chemed,

including the governmental investigations and lawsuits detailed herein. Moreover, going back to 2005, as noted in Chemed's 2006 Annual Report, as part of its investigation into violations of Medicare and Medicaid rules by VITAS and Chemed, the OIG selected medical records for 320 past and current patients from VITAS' three largest programs for review. It also sought policies and procedures dating back to 1998 covering admissions, certifications, recertifications and discharges. During the third quarter of 2005 and again in May 2006, the OIG requested additional information from Chemed. The Audit Committee Defendants were provided with specific reports regarding these specific VITAS records by the individuals noted above, beginning in 2005 and continuing thereafter throughout the Relevant Period. As a result of being presented with findings regarding these documents and the OIG review, the Audit Committee Defendants were made aware of the Medicare violations by VITAS and the materially deficient internal controls at Chemed concerning VITAS and Medicare and Medicaid compliance. As Chemed admitted in its 2012 Annual Report: "From time to time Vitas receives survey reports containing statements of deficiencies [with the Conditions of Participation governing Medicare reimbursement for hospice services]." The Audit Committee Defendants, in turn, discussed these issues with the other Director Defendants at the regular Board meetings beginning in 2005 and continuing throughout the Relevant Period. In 2010, the Board met nine (9) times. In 2011, the Board met five (5) times. In 2012, the Board met seven (7) times. Thus, all the Director Defendants had actual knowledge of or consciously disregarded VITAS' violations of federal law and Chemed's prolonged and continued failure to implement and maintain adequate internal controls to address these material deficiencies.

    **(10)    February 28, 2011 Form 10-K for FY 2010**

    163.    On February 28, 2011, Chemed filed its annual report for the year ended December 31, 2010 on Form 10-K ("2010 10-K"), which was signed by Defendants McNamara,

Williams, Gemunder, Grace, Rice, Hutton, Krebs, Lindell, Wood, Saunders and Walsh, and

which set forth the Company's financial results.  The 2010 10-K described Medicare's billing

audits and claims review process, stating, in pertinent part, as follows:

> Billing Audits/Claims Reviews. **The Medicare program and its fiscal intermediaries and other payors periodically conduct pre-payment or post-payment reviews** and other reviews and audits of health care claims, including hospice claims.  There is pressure from state and federal governments and other payors to scrutinize health care claims to determine their validity and appropriateness.   In order to conduct these reviews, the payor requests documentation from Vitas and then reviews that documentation **to determine compliance with applicable rules and regulations, including the eligibility of patients to receive hospice benefits**, the appropriateness of the care provided to those patients and the documentation of that care.  During the past several years, Vitas' claims have been subject to review and audit.  We make appropriate provisions in our accounting records to reduce our revenue for anticipated denial of payment related to these audits and reviews.  **We believe our hospice programs comply with all payor requirements at the time of billing.**  However, we cannot predict whether future billing reviews or similar audits by payors will result in material denials or reductions in revenue.

164.    The 2010 10-K also discussed "Regulatory Matters," stating, in pertinent part, as

follows:

> In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting VITAS deliver to the OIG documents, patient records, and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to the date of the letter.  In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review.  In February 2010, VITAS received a companion civil investigative demand ("CID") from the state of Texas Attorney General's Office, seeking related documents.  In September 2010, it received a second CID and a second administrative subpoena seeking related documents.  We can neither predict the outcome of this investigation nor estimate our potential liability, if any.  **We believe that we are in compliance with Medicare and Medicaid rules and regulations applicable to hospice providers**.

165.    The statements referenced above in ¶¶ 163-64 that VITAS' "hospice programs

comply with all payor requirements at the time of billing" and "are in material compliance with

Medicare and Medicaid rules and regulations" were materially false and misleading when made

because, at the time they were made, the Individual Defendants knew or consciously ignored the

fact that Chemed and VITAS were violating Medicare and Medicaid rules and regulations by admitting patients who did not qualify for hospice care, recertifying patients who were not qualified for hospice treatment under Medicare laws and guidelines and improperly billing the government for inappropriate services rendered to hospice patients, for the reasons set forth in detail in ¶ 162. The Director Defendants specifically reviewed, approved and signed the 2010 Annual Report, including its statements about Chemed's compliance with legal and regulatory matters. Moreover, before signing the 2010 Form 10-K, the Audit Committee Defendants (Defendants Rice, Saunders and Grace) specifically discussed with both the Company's management and outside auditors the financial statements contained in the annual report and the representations regarding the adequacy of Chemed's internal controls. The Proxy Statement filed with the SEC on April 5, 2011 contained an "Audit Committee Report" which was signed by Defendants Rice, Saunders and Grace and stated:

"1. *The Audit Committee [Rice, Saunders and Grace] has reviewed and discussed the audited financial statements and management's report on internal control over financial reporting with the Company's management.*"

"2. *The Audit Committee has discussed with the independent accountants the matters required to be discussed by SAS 61.*"

"3. The Audit Committee has received the written disclosures and the letter from the independent accountants required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountants' communications with the Audit Committee concerning independence and has discussed with the independent accountants the independent accountants' independence."

"4. Based on the review and discussion referred to in paragraphs (1) through (3) above, *the Audit Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2010, for filing with the SEC.*"

**(11)     April 25, 2010 and April 26, 2010 Statements Regarding 1Q11 Results**

- 69 -

166.    On April 25, 2011, Chemed issued a press release announcing its financial results for the first quarter of 2011, the period ended March 31, 2011.  For the quarter, the Company reported revenues of $331 million and net income of $18.1 million.  In the VITAS segment, the Company reported net revenues of $236 million, net income of $18.1 million, and patient admissions of 15,798 for the quarter.  The press release described the reasons for revenue growth in VITAS, stating, in pertinent part, as follows:

> ***Net revenue for VITAS was $236 million in the first quarter of 2011***, which is an increase of 5.7% over the prior-year period.  Both periods include revenue from the reversal of Medicare Cap accruals.  Excluding this impact of Medicare Cap, revenue increased 6.1%.  ***This revenue growth was the result of increased ADC of 4.8%, driven by an increase in admissions of 6.4%, combined with Medicare price increases of approximately 2.1%.***  This growth was partially offset by geographic and level of acuity mix shift of the patient base.

> ***Average revenue per patient per day in the quarter***, excluding the impact of Medicare Cap, ***was $201.82***, which is 1.2% above the prior-year period.  Routine home care reimbursement and high acuity care averaged $157.93 and $696.25, respectively, per patient per day in the first quarter of 2011.  During the quarter, high acuity days of care were 8.2% of total days of care, 35 basis points lower than the prior-year quarter.

167.    The next day, on April 26, 2011, Chemed held a conference call for analysts and investors to discuss the Company's earnings release and operations.  Defendants McNamara, Williams and O'Toole participated in the conference call and made the following statements regarding the performance of the Company's VITAS segment:

Defendant McNamara:

In the first quarter of 2011, our admissions totaled 15,798, an increase of 6.4% over the prior-year quarter.  ***The growth in our admissions in 2010 and 2011 are attributable to several factors.  We continue to expand our presence in local communities with new or refurbished inpatient units.***  This provides VITAS with increased visibility to our referral sources, as well as an increased capacity to provide hospice care to our high acuity patients.

As of March 31, 2011, VITAS has 32 dedicated IPUs with a total daily capacity of 427 beds.  This is an increase of 6% over the prior-year quarter.  Approximately 73% of our inpatient days of care are within these dedicated units.  The remaining

27% of our high acuity inpatient care provided within short-term contract beds. I anticipate this approach in using inpatient units of maximizing our visibility within the healthcare community to be a permanent part of our admissions strategy. We continue to expand our marketing and community liaison personnel in terms of staffing, training, and support. *These investments in personnel, coupled with our inpatient units, have resulted in significant improvement in overall admission strengths.*

           \*      \*      \*

Defendant Williams:

Thanks, Kevin. The net revenue for VITAS was $236 million in the first quarter of 2011, which is an increase of 5.7% over the prior-year period. If you exclude the impact of Medicare cap, our revenue increased 6.1%. This *revenue growth was the result of increased ADC of 4.8%, driven by an increase in admissions of 6.4%, combined with Medicare price increases of approximately 2.1%*. This was partially offset by acuity and geographic mix shift of our patient base.

           \*      \*      \*

Defendant O'Toole:

Thank you, David. As most of you are aware, *we have put considerable effort into our field-based sales and marketing efforts over the past year.* We have made significant investments in terms of admission personnel, community liaisons, long-term care liaisons, and admissions coordinators. These investments have been in the form of increased personnel training and educational materials. *This focus has resulted in VITAS generating a record 15,798 admissions in the quarter, an increase of 6.4% over the first quarter of 2010.* At this rate, VITAS is on track to provide end-of-life care to more than 76,000 patients in 2011.

During the quarter, our largest state, *Florida, increased admissions 8.5%, and our second largest state presence, California, expanded admissions 7.9%. We were able to expand admissions in 11 of the 15 states, plus the District of Columbia, in which VITAS operates. Admissions have increased in each of our four largest referral categories. During the first quarter of 2011, home-based admissions increased 5.9%. Assisted care living facilities increased 14%. Hospital referred admissions increased 7.5%. And nursing home admissions increase 0.2%.*

*In addition to the significant expansion of our admissions-focused personnel, growth in admissions is also attributed to our focus on expanding inpatient capacity.* This strategy raises VITAS's visibility within the healthcare community, resulting in increased admissions. In addition, providing more high acuity care further minimizes the likelihood of reaching billing limitations under the Medicare cap formula.

168.   The statements referenced above in ¶¶ 166-67 were materially false and misleading when made for the reasons stated in ¶ 137 and ¶ 162.

**(12)   April 29, 2011 1Q11 Form 10-Q**

169.   On April 29, 2011, the Company filed its quarterly report for the first quarter of 2011 on Form 10-Q and reiterated the financial results reported on April 25, 2011. The Form 10-Q was reviewed and approved by the Director Defendants and signed by Defendants McNamara and Williams. Additionally, the quarterly report discussed "Legal and Regulatory Matters" and stated, in pertinent part, as follows:

> In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting VITAS deliver to the Office of Inspector General for the Department of Health and Human Services ("OIG") documents, patient records, and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to the date of the letter. In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review. In February 2010, VITAS received a companion civil investigative demand from the state of Texas Attorney General's Office, seeking related documents. In September 2010, it received a second CID and a second administrative subpoena seeking related documents. In April 2011, the U.S. Attorney provided the Company with a copy of a qui tam complaint filed under seal in U.S. District Court for the Northern District of Texas. The complaint and all the filings in the action remain under seal. The U.S. Attorney has not decided whether to intervene in the action. We are conferring with the U.S. Attorney regarding the Company's defenses to the complaint's allegations. We can neither predict the outcome of this investigation nor estimate our potential liability, if any. ***We believe that we are in compliance with Medicare and Medicaid rules and regulations applicable to hospice providers.***

170.   The statements referenced above that VITAS is "in material compliance with Medicare and Medicaid rules and regulations" were materially false and misleading when made for the same reasons set forth in ¶137 and ¶162.

171.   On or about July 18, 2011, the OIG published a report titled "Medicare Hospices That Focus on Nursing Facility Residents" regarding concerns raised about Medicare hospice

care for nursing facility residents, including inappropriate enrollment and compensation. Nothing specific to Chemed or VITAS was included in the report.

(13)    **July 26, 2011 and July 27, 2011 Statements Regarding 2Q11 Results**

172.    On July 26, 2011, Chemed issued a press release announcing its financial results for the second quarter of 2011, the period ended June 30, 2011.  For the quarter, the Company reported revenues of $333 million and net income of $20.29 million.  In the VITAS segment, the Company reported net revenues of $243 million, net income of $18.6 million, and patient admissions of 15,294 for the quarter.  The press release described the reasons for revenue growth in VITAS, stating, in pertinent part, as follows:

> ***Net revenue for VITAS was $243 million in the second quarter of 2011***, which is an increase of 7.3% over the prior-year period.  Excluding the impact of Medicare Cap, revenue increased 7.4%.  ***This revenue growth was the result of increased ADC of 5.8%, driven by an increase in admissions of 6.0%, combined with Medicare price increases of approximately 2.1%.***  This growth was partially offset by geographic and level of acuity mix shift of the patient base.
>
> ***Average revenue per patient per day in the quarter***, excluding the impact of Medicare Cap, ***was $200.99***, which is 1.6% above the prior-year period.  Routine home care reimbursement and high acuity care averaged $158.67 and $696.00, respectively, per patient per day in the second quarter of 2011.  During the quarter, high acuity days of care were 7.9% of total days of care, 20 basis points lower than the prior-year quarter.

173.    The next day, on July 27, 2011, Chemed held a conference call for analysts and investors to discuss the Company's earnings release and operations.  Defendants McNamara, Williams and O'Toole participated in the conference call and Defendant McNamara made the following statements regarding VITAS' "success in achieving excellent admissions growth":

> In the second quarter of 2011, our admissions totaled 15,294, an increase of 6.0% over the prior year quarter.  ***Our success in achieving excellent admissions growth is attributed to several factors***.  We continue to expand our presence in local communities with new or refurbished in-patient units.  This provides VITAS with increased visibility to our referral sources as well as increased capacity to provide hospice care to our high acuity patients.

- 73 -

*      *      *

We've also continued to expand our marketing and community liaison structure in terms of staffing, training and support.  These *investments in personnel, coupled with our in-patient units have resulted in a significant improvement in over all admissions trends*.

Defendant O'Toole also commented on VITAS' admissions, stating, in pertinent part, as follows:

. . . As most of you are aware, *we continue to put significant efforts into our admission focus and initiatives*.  *One of the most important aspects to increased admissions is appropriately focused field-based sales and marketing personnel*.  As of June 30, 2011, we have 305 sales representatives, 143 admissions coordinators, 342 admission nurses, 111 community liaisons and 23 long-term care liaisons.  Sales representatives and admissions personnel have expanded 6.8% compared to the second quarter of 2010.

*This focus has resulted in VITAS generating 15,294 admissions in the quarter, an increase of 6% over the second quarter of 2010.*  At this rate, VITAS is on track to provide end-of-life care to more than 76,000 patients in 2011.

*During the quarter, our largest state, Florida, increased admissions 8.4% and our second largest state presence, California, expanded admissions 2.7%.*  We were able to expand admissions in 13 of the 16 states plus the District of Columbia in which VITAS operates.

*Admissions have increased in three of our four largest referral categories. During the second quarter of 2011, home-based admissions increased 7.6%, assisted care living facilities increased 12.5% and hospital referred admissions increased 5.2%.*  Nursing home admissions decreased by 5.2%.

174.    During the conference call, Defendants responded to questions about the OIG hospice report that was released in July 2011 and downplayed the issues raised in the report and their applicability to Chemed.

175.    For example, Brian Zimmerman, an analyst with Deutsche Bank, posed the following question during the conference call:

Hi.  Thanks and good morning.  This is Brian Zimmerman in for Darren.  Last week the Office of Inspector General came out with a report focusing on Medicare hospices that focus on nursing facility residents.  Do you see the government's interest in this area as a potential risk?  And the second part of that question is, we've noticed a decline year-over-year in average daily census in nursing

- 74 -

facilities, has that changed from competition, from skilled nursing facilities or are you de-emphasizing growth in that setting?

176.     The first response to Mr. Zimmerman's question came from Defendant McNamara, who stated that Chemed had grown less dependent on nursing facilities as they started operating their own in-house hospice facilities.

177.     Defendant O'Toole then responded to both questions posed by Mr. Zimmerman, responding first to his question about the decline in year-over-year census in nursing facilities and the impact that has on VITAS:

> Yes, just a couple of things. As Kevin highlights, the trend in the nursing homes census for us have been mirroring the reduction and overall nursing home facility beds in the country. There are more ALF beds being built and that's really -- we are just following the industry. Our percentage of nursing home patients, very similar to what it's been in the past, around 30% and we are very pleased with that and think our future there is very good.

178.     Defendant O'Toole then responded to Mr. Zimmerman's first question, concerning the OIG report and the potential risk to VITAS and Chemed of the government's focus on Medicare hospices serving nursing homes:

> Briefly speaking about the OIG report, as Kevin mentioned.  They sensed some issues there. I think what we would say is hospices are very, very important service that's provided to nursing home patients and just because someone happens to have their residence in a nursing home should not mean they are not entitled to their hospice benefit.

> We feel very strongly about that.  They raised some concerns about captives, where some companies have maybe two-thirds or more of their census from nursing home patients that they own the nursing home. That may be something they need to look at.

> ***VITAS is independent.  We don't have that issue at all. We are very comfortable with where we sit.***  Also keep in mind, hospice is additional services.  The OIG report indicates some comments about there's care givers already there.  Those care givers are not allowed to do hospice services and hospice provides additional services and keep in mind that because hospice is provided for nursing home patients, those patients can stay in the nursing home and aren't shifted aggressively to a higher acuity facility, aka a hospital, where their cost structure would be much higher.

> So there's parts of the OIG report I disagree with. Some of the comments are not new. They've been focused on it for a long time. CMS has already responded to the OIG report and they said they will call the issue to the attention of the auditors and so forth about the self-referrals. And as far as the change in the payment system, the OIG highlights that they are already looking at changing the system for a U-shaped curve. They are gathering a lot of data. This is one period they will look at but I will not see any changes there soon.

179.    The statements referenced above in ¶¶172-78 were materially false and misleading when made for the reasons stated in ¶137. In addition, because VITAS was improperly enrolling ineligible patients – including nursing home patients – for hospice services, Defendants had no basis for their statements that they "are comfortable with where [they] sit" with regard to the OIG investigation and "don't have that issue at all."

**(14)    August 5, 2011 2Q11 Form 10-Q**

180.    On August 5, 2011, the Company filed its quarterly report for the second quarter of 2011 on Form 10-Q and reiterated the financial results reported on July 26, 2011. Additionally, the quarterly report discussed "Legal and Regulatory Matters" and stated, in pertinent part, as follows:

> In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting VITAS deliver to the Office of Inspector General ("OIG") for the Department of Health and Human Services documents, patient records, and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to the date of the letter. In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review. In February 2010, VITAS received a companion civil investigative demand ("CID") from the State of Texas Attorney General's Office, seeking related documents. In September 2010, it received a second CID and a second administrative subpoena seeking related documents. In April 2011, the U.S. Attorney provided the Company with a copy of a qui tam complaint filed under seal in U.S. District Court for the Northern District of Texas. In June 2011, the U.S. Attorney provided the company with a partially unsealed second qui tam complaint filed under seal in the U.S. District Court for the Western District of Texas. In June 2011, the U.S. Attorney also provided the Company with a partially unsealed third qui tam complaint filed under seal in the Northern District of Illinois, Eastern Division. The complaint and all the filings in each of these actions remain under seal. The U.S. Attorney has

not decided whether to intervene in any of the actions.  We are conferring with the U.S. Attorney regarding the Company's defenses to each complaint's allegations. We can neither predict the outcome of this investigation nor estimate our potential liability, if any.  ***We believe that we are in compliance with Medicare and Medicaid rules and regulations applicable to hospice providers.***

181.    The statements referenced above that VITAS is "in material compliance with Medicare and Medicaid rules and regulations" were materially false and misleading when made because, at the time they were made, Defendants knew or consciously ignored the fact that Chemed and VITAS were violating Medicare and Medicaid rules and regulations by admitting patients who did not qualify for hospice care, recertifying patients who were not qualified for hospice treatment under Medicare laws and guidelines and improperly billing the government for inappropriate services rendered to hospice patients.  In addition to the specific facts supporting the knowledge of the Officer Defendants and Director Defendants detailed above in ¶137 and ¶162, by August 2011 all the Individual Defendants had received additional significant briefings pertaining to the administrative subpoena from the U.S. Department of Justice as well as the documents produced by VITAS to the OIG concerning VITAS, which included patient records and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to May 2009, including medical records for 59 past and current patients from a Texas program.  The Officer Defendants and Director Defendants also received detailed reports in 2010 and 2011 regarding the documents VITAS and Chemed produced to the State of Texas Attorney General's Office in response to its CIDs.   Upon information and belief, those reports advised the Individual Defendants of material deficiencies in VITAS' compliance with Medicare and Medicaid rules and in Chemed's internal controls concerning such compliance.

**(15)    October 25, 2011 and October 26, 2011 Statements Regarding 3Q11 Results**

182.    On October 25, 2011, Chemed issued a press release announcing its financial results for the third quarter of 2011, the period ended September 30, 2011.  For the quarter, the Company reported revenues of $341 million and net income of $21.89 million.  In the VITAS segment, the Company reported net revenues of $253 million, net income of $21 million, and patient admissions of 14,879 for the quarter.  The press release described the reasons for revenue growth in VITAS, stating, in pertinent part, as follows:

> *Net revenue for VITAS was $253 million in the third quarter of 2011*, which is an increase of 8.1% over the prior-year period.  Excluding the impact of Medicare Cap, revenue increased 7.9%.  *This revenue growth was the result of increased ADC of 6.2%, driven by an increase in admissions of 2.7%, combined with Medicare price increases of approximately 2.1%.*  This growth was partially offset by geographic and level of acuity mix shift of the patient base.

> *Average revenue per patient per day in the quarter*, excluding the impact of Medicare Cap, *was $201.00*, which is 1.6% above the prior-year period.  Routine home care reimbursement and high acuity care averaged $158.83 and $704.73, respectively, per patient per day in the third quarter of 2011.  During the quarter, high acuity days of care were 7.7% of total days of care, 22 basis points lower than the prior-year quarter.

183.    The next day, on October 26, 2011, Chemed held a conference call for analysts and investors to discuss the Company's earnings release and operations.  Defendants McNamara, Williams and O'Toole participated in the conference call and Defendant McNamara made the following statements regarding VITAS' "success in achieving excellent admissions growth":

> In the third quarter of 2011 our admissions totaled 14,879, an increase of 2.7% over the prior year quarter.  On a year-to-date basis admissions have increased 5.1%.  *Our success in achieving excellent admissions growth is attributed to several factors.  We continue to expand our presence in local communities with new or refurbished inpatient units.  This provides VITAS with increased visibility to our referral sources as well as increased capacity to provide hospice care to our high acuity patients.*

- 78 -

*       *       *

We continue to expand our marketing and community liaison structure in terms of staffing, training and support.  The head count for this group has increased 12.4% when compared to the prior year.  *These investments in personnel coupled with our inpatient units have resulted in significant momentum and overall improvement in the aggregate admission trends.*

Defendant O'Toole also commented on VITAS' admissions, stating, in pertinent part, as follows:

*We continue to put significant efforts into our marketing and admission initiatives.  One of the most important aspects of these initiatives is appropriately focused field based sales and marketing personnel.*  As of September 30, 2011, we have 317 sales representatives, 155 admissions coordinators, 363 admission nurses, 170 community liaisons and 26 long term care liaisons.  Staffing in these areas has expanded 12.4% compared to the third quarter of 2010.  *This focus has resulted in VITAS generating 45,971 admissions in the first nine months of 2011, an increase of 5.1% over the prior year period.*  At this rate VITAS will provide end of life care to more than 75,000 patients in 2011.

*Admissions have increased in all four of our largest referral categories.  During the third quarter of 2011, home based admissions increased 2.8%.  Assisted care living facilities increased 5.1%.  Nursing home admissions increased 1.7%, and hospital referred admissions increased 0.1%.*

184.    The statements referenced above in ¶¶ 182-83 were materially false and misleading when made for the reasons set forth in ¶¶ 137, 162, and 181.

**(16)    November 4, 2011 3Q11 Form 10-Q**

185.    On November 4, 2011, the Company filed its quarterly report for the third quarter of 2011 on Form 10-Q and reiterated the financial results reported on October 25, 2011.  Additionally, the quarterly report discussed "Legal and Regulatory Matters" and stated, in pertinent part, as follows:

In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting VITAS deliver to the Office of Inspector General ("OIG") for the Department of Health and Human Services documents, patient records, and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to the date of the letter.  In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review.  In February 2010, VITAS received a companion civil investigative demand ("CID") from the State of Texas

Attorney General's Office, seeking related documents.  In September 2010, it received a second CID and a second administrative subpoena seeking related documents.  In April 2011, the U.S. Attorney provided the Company with a copy of a qui tam complaint filed under seal in U.S. District Court for the Northern District of Texas.  In June 2011, the U.S. Attorney provided the company with a partially unsealed second qui tam complaint filed under seal in the U.S. District Court for the Western District of Texas.  In June 2011, the U.S. Attorney also provided the Company with a partially unsealed third qui tam complaint filed under seal in the Northern District of Illinois, Eastern Division.  The complaint and all the filings in each of these actions remain under seal.  The U.S. Attorney has not decided whether to intervene in any of the actions.  We are conferring with the U.S. Attorney regarding the Company's defenses to each complaint's allegations.  We can neither predict the outcome of this investigation nor estimate our potential liability or range of potential loss, if any.  ***We believe that we are in compliance with Medicare and Medicaid rules and regulations applicable to hospice providers.***

186.    The statements referenced above that VITAS is "in material compliance with Medicare and Medicaid rules and regulations" were materially false and misleading when made for the reasons detailed above in ¶¶137, 162, and 181.

187.    On November 16, 2011, prior to the close of the market, a *Bloomberg News* article titled "Whistleblower Accuses Chemed Unit of Medicare HMO Conspiracy" disclosed that a former VITAS general manager accused Chemed of defrauding the federal government by conspiring with health insurers to enroll Medicare patients who were not dying.  According to the former VITAS general manager, VITAS conspired with two HMOs to admit their unprofitable patients into hospice even though they were not facing imminent death and thus were not eligible for hospice care under Medicare rules.  This benefitted VITAS by increasing its hospice customers and enabled the HMOs "to dump non-profitable patients onto hospice, regardless of their qualifications."  The article also discussed a U.S. Department of Justice investigation into unlawful conduct by VITAS.  The article stated, in pertinent part, as follows:

A former Vitas Healthcare Corp. manager has accused the hospice chain of defrauding the federal government by conspiring with health insurers to enroll Medicare patients who weren't dying.

- 80 -

Vitas, a unit of Cincinnati-based Chemed Corp. (CHE), is the largest U.S. provider of hospice care, which has attracted government scrutiny as its Medicare-covered patients have doubled to 1.1 million over the last decade.

Chemed fell 15 percent, the most since April 2008, to $49.10 at 10:37 a.m. in New York.

The allegations came in a lawsuit unsealed last week in U.S. District Court in Dallas. Vitas spokeswoman Kal Mistry said the company "cannot comment on pending litigation."

In the same court, the Department of Justice is seeking internal Vitas documents in an investigation focused on alleged abuses of federal health-insurance programs. **The government has told the court it suspects Vitas of "an extensive scheme" to defraud Medicare and Medicaid of "hundreds of millions of dollars" by falsifying records and hospice certifications.**

Vitas has "consistently been in compliance with Medicare and Medicaid rules," Mistry said.

The newly unsealed suit was filed by Michael Rehfeldt, a former branch manager for Vitas in San Antonio, who is seeking damages for the government as a whistleblower under the U.S. False Claims Act, which entitles him to part of any recoveries. Such claims are also called qui tam suits.

**"False certifications, fraudulent billing and cost shifting to the United States constitute a widespread, systematic practice endemic to Vitas,"** Rehfeldt's suit alleges.

**Investigation Continuing**

The Justice Department said in a court filing that it is "not intervening at this time" in the whistleblower suit, although "its investigation of the allegations will continue." The Texas Attorney General's office filed an identical notice.

Vitas has been Chemed's main engine of growth, accounting for 74 percent of the company's $341.4 million of revenue in the third quarter, when it reported net income of $21.9 million. Chemed also operates the Roto-Rooter drain-cleaning and plumbing chain.

Rehfeldt, who left Vitas in 2009, also named as defendants WellMed Medical Management Group and Care Level Management LLC, health-maintenance organizations acquired in March by Minnetonka, Minnesota-based UnitedHealth Group Inc. (UNH).

Vitas conspired with the two HMOs to admit their unprofitable patients into hospice, though they weren't facing imminent death and thus weren't eligible for hospice under Medicare rules, the lawsuit says. It says the arrangement allegedly benefitted Vitas by providing hospice patients, while allowing "the HMO defendants to dump non-profitable patients onto hospice, regardless of their qualifications."

**'Strong Message'**

WellMed and Care Level spokesmen denied Rehfeldt's allegations. The HMOs said the Justice Department and the Texas Attorney General's office have told the companies that they are not joining in the case against WellMed or Inspiris, the UnitedHealth unit that owns Care Level.

"We believe their decisions are correct and send a strong message regarding the merits of this suit," said David Canniff, chief financial officer of Inspiris.

Rehfeldt told his bosses about the misconduct and they ignored him, according to the lawsuit, which says top Vitas executives knew about the illegal arrangement.

A former Vitas executive in Texas, Keith Becker, teamed up with Justo Cisneros, a former Vitas medical director who also worked for the HMOs, "both large referral sources for Vitas," according to the whistleblower complaint. Cisneros referred, enrolled and recertified patients at Vitas who weren't terminally ill, the suit says.

**'Paradigm Shift'**

To be eligible for hospice, Medicare requires patients must have six months or less to live, certified by two doctors. Yet a patient can stay on hospice indefinitely, as long as a hospice doctor recertifies their terminal diagnosis every 60 days.

"Cisneros signed, wholesale, hundreds or perhaps thousands of certifications without examining patients or even reviewing their charts," Rehfeldt claims in the suit.

Both Becker and Cisneros now work for Inspiris, which owns a hospice in San Antonio. Becker did not return phone messages.

Cisneros denied conspiring to enroll ineligible patients at Vitas. The company's San Antonio operation got caught in a government "paradigm shift," he said in a telephone interview.

After encouraging hospices to enroll more patients with diagnoses such as dementia and "general debility," Medicare cracked down on the long stays that resulted from admitting them, according to Cisneros.

"These patients were sick," he said. "Yes, they were on longer, but they were needy."

**'Rules Changed'**

In 2008, 22 percent of Vitas's 560 patients in San Antonio were on hospice for at least 500 days, according to Rehfeldt's suit. The average length of stay for all Medicare hospice patients in 2008 was 83 days.

After a Medicare audit of the Vitas San Antonio office in 2007, the company discharged 295 live patients in 2007 and 2008, compared to a total of 64 live discharges in 2005 and 2006, the suit alleges.

"They changed the rules in the middle of the game," Cisneros said. "There was a lot of confusion."

188. The *Bloomberg News* article and the newly unsealed *qui tam* complaint revealed to investors for the first time that the scope of the government investigation, and the claims raised in the *qui tam* suit, were not limited to a specific VITAS facility and were not discontinued practices. As alleged in the newly unsealed *qui tam* complaint, the wrongdoing was part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through unlawful certification and recertification of hospice patients and improper billing of the United States through Medicare or Medicaid. As stated in the *Bloomberg News* article, the government's investigation into VITAS' "extensive scheme" was proceeding separately from the *qui tam* action.

189. In response to the November 16, 2011 announcements, the trading price of the Company's stock fell $6.87 per share, or 11%, to close at $50.65 per share on November 16, 2011, on extremely heavy trading volume. Chemed's stock, however, remained artificially inflated as a result of materially false and misleading statements and omissions made by Defendants during the Relevant Period.

**(17)      February 27, 2012 Form 10-K for FY2011**

190.    On February 27, 2012, Chemed filed its annual report for the year ended December 31, 2011 on Form 10-K ("2011 10-K"), which was reviewed, approved and signed by each of the Director Defendants and by Defendants McNamara and Williams.  The 2011 Form 10-K Annual Report set forth the Company's financial results for fiscal year 2011.  The 2011 10-K described Medicare's billing audits and claims review process, stating, in pertinent part, as follows:

> Billing Audits/Claims Reviews. The Medicare program and its fiscal intermediaries and other payors periodically conduct pre-payment or post-payment reviews and other reviews and audits of health care claims, including hospice claims.  There is pressure from state and federal governments and other payors to scrutinize health care claims to determine their validity and appropriateness.  In order to conduct these reviews, the payor requests documentation from Vitas and then reviews that documentation to determine compliance with applicable rules and regulations, including the eligibility of patients to receive hospice benefits, the appropriateness of the care provided to those patients and the documentation of that care.  Vitas' claims have been subject to review and audit.  We make appropriate provisions in our accounting records to reduce our revenue for anticipated denial of payment related to these audits and reviews.  ***We believe our hospice programs comply with all payor requirements at the time of billing.***  However, we cannot predict whether future billing reviews or similar audits by payors will result in material denials or reductions in revenue.

191.    The 2011 10-K also discussed "Regulatory Matters," stating, in pertinent part, as follows:

> In May 2009, Vitas received an administrative subpoena from the U.S. Department of Justice requesting Vitas deliver to the OIG documents, patient records, and policy and procedure manuals for headquarters and its Texas  programs concerning hospice services provided for the period January 1, 2003 to the date of the letter.  In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review.   In February 2010, VITAS received a companion civil investigative demand ("CID") from the State of Texas Attorney General's Office, seeking related documents.  In September 2010, it received a second CID and a second administrative subpoena seeking related documents.  In April 2011, the U.S. Attorney provided the Company with a copy of a qui tam complaint filed under seal in U.S. District Court for the Northern District of Texas. The Court unsealed this complaint in November 2011.  The U.S. Attorney and the

Attorney General for the State of Texas filed a notice in November 2011 that they had decided not to intervene at that time in the case.  They continue to investigate its allegations.  It was brought by Michael Rehfeldt, a former VITAS San Antonio program general manager, against VITAS, the program's former Regional Vice President Keith Becker, its former Medical Director Justo Cisneros, and their current employers: WellMed Medical Management, Care Level Management LLC, and Inspiris Inc.  It alleges admission and recertification of inappropriate patients, backdating revocations, and conspiring with HMO defendants to admit inappropriate patients to hospice.  In June 2011, the U.S. Attorney provided the Company with a partially unsealed second qui tam complaint filed under seal in the U.S. District Court for the Western District of Texas.  In June 2011, the U.S. Attorney also provided the Company with a partially unsealed third qui tam complaint filed under seal in the Northern District of Illinois, Eastern Division. We are conferring with the U.S. Attorney regarding the Company's defenses to each complaint's allegations.   We can neither predict the outcome of this investigation nor estimate our potential liability or range of potential loss, if any. **_We believe that we are in compliance with Medicare and Medicaid rules and regulations applicable to hospice providers._**

192.   The statements referenced above in ¶¶ 190-91 that VITAS' "hospice programs comply with all payor requirements at the time of billing" and "are in material compliance with Medicare and Medicaid rules and regulations" were materially false and misleading when made for the reasons detailed above in ¶¶137, 162, and 181.  The Director Defendants specifically reviewed, approved and signed the 2011 Annual Report, including its statements about Chemed's compliance with legal and regulatory matters.  Moreover, before signing the 2011 Form 10-K, the Audit Committee Defendants (Defendants Rice, Saunders and Grace) specifically discussed with both the Company's management and outside auditors the financial statements contained in the annual report and the representations regarding the adequacy of Chemed's internal controls.  The Proxy Statement filed with the SEC on April 3, 2012 contained an "Audit Committee Report" which was signed by Defendants Rice, Saunders and Grace which stated:

"1.   **_The Audit Committee [Rice, Saunders and Grace] has reviewed and discussed the audited financial statements and management's report on internal control over financial reporting with the Company's management._**"

"2. ***The Audit Committee has discussed with the independent accountants the matters required to be discussed by SAS 61.***"

"3. The Audit Committee has received the written disclosures and the letter from the independent accountants required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountants' communications with the Audit Committee concerning independence and has discussed with the independent accountants the independent accountants' independence."

"4. Based on the review and discussion referred to in paragraphs (1) through (3) above, ***the Audit Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2011, for filing with the SEC***."

**(18)      April 30, 2012 1Q12 Form 10-Q**

193.     On April 30, 2012, the Company filed its quarterly report for the first quarter of 2012 filed with the SEC on Form 10-Q, which discussed "Legal and Regulatory Matters" and stated, in pertinent part, as follows:

> In May 2009, VITAS received an administrative subpoena from the U.S. Department of Justice requesting VITAS deliver to the OIG documents, patient records, and policy and procedure manuals for headquarters and its Texas programs concerning hospice services provided for the period January 1, 2003 to the date of the letter.  In August 2009, the OIG selected medical records for 59 past and current patients from a Texas program for review.  In February 2010, VITAS received a companion civil investigative demand ("CID") from the State of Texas Attorney General's Office, seeking related documents. In September 2010, it received a second CID and a second administrative subpoena seeking related documents.  In April 2011, the U.S. Attorney provided the Company with a copy of qui tam complaint filed under seal in the U.S. District Court for the Northern District of Texas.  The Court unsealed this complaint in November 2011.  The U.S. Attorney and the Attorney General for the State of Texas filed a notice in November 2011 that they had decided not to intervene at that time in the case. They continue to investigate its allegations.  It was brought by Michael Rehfelt, a former Vitas San Antonio program general manager, against Vitas, the program's former Regional Vice President Keith Becker, its former Medical Director Justos Cisneros, and their current employers: Wellmed Medical Management, Care Level Management LLC, and Inspiris Inc.  Plaintiff dismissed his case against their current employers in March of 2012.   The case alleges admission and recertification of inappropriate patients, backdating revocations, and conspiring to admit inappropriate patients to hospice.  In June 2011, the U.S. Attorney provided the Company with a partially unsealed second qui tam complaint filed under seal

in the U.S. District court for the Western District of Texas.  In June 2011, the U.S. Attorney also provided the Company with a partially unsealed third qui tam complaint filed under seal in the Northern District of Illinois, Eastern Division. We are conferring with the U.S. Attorney regarding the Company's defenses to each complaint's allegations.  We can neither predict the outcome of this investigation nor estimate our potential liability, if any.  ***We believe that we are in compliance with Medicare and Medicaid rules and regulations applicable to hospice providers.***

194.    The statement referenced above that VITAS is "in compliance with Medicare and Medicaid rules and regulations" was materially false and misleading when made because, at the time they were made, Defendants knew or consciously ignored the fact that Chemed and VITAS were violating Medicare and Medicaid rules and regulations by admitting patients who did not qualify for hospice care, recertifying patients who were not qualified for hospice treatment under Medicare laws and guidelines, and improperly billing the government for inappropriate services rendered to hospice patients.

**(19)    July 26, 2012 Statements Regarding 2Q12 Results**

195.    On July 26, 2012, Chemed held a conference call for analysts and investors to discuss the Company's earnings release and operations for the second quarter of 2012. Defendants McNamara, Williams and O'Toole participated on the conference call and spoke positively about the Company's business and prospects.  Defendant McNamara made the following statements regarding VITAS' admissions programs and systems:

On the litigation front, we've had no significant developments on preexisting claims.  However, in June 2012, we received an administrative subpoena from the office of the Inspector General of the US Department of Health and Human Services, focusing on our southern California hospice program's Medicare claims and seeking documents from January 2007.  The OIG has requested information related to procedures and policies surrounding admission, recertification, and documentation of long-stay patients.  We also received a subpoena from the state of Florida in July of 2012 that seeks documents concerning similar issues over the same time period. We are unable to estimate the timing or outcome of these investigations or our potential liability, if any, with respect to these matters. ***VITAS takes great pride in its systems, admissions programs, and patient documentation policies.  This is the foundation for supporting our Medicare and***

> *Medicaid billings. We have invested significant resources in creating and maintaining this infrastructure that maintains detailed, contemporaneous documentation for every patient. We believe this is the most appropriate way to ensure all our patients receive appropriate care and our Medicare and Medicaid billings are appropriately supported.*

196. The statements referenced above were materially false and misleading when made for the reasons detailed above in ¶¶137, 162, and 181.

197. On August 2, 2012, the Company filed its Form 10-Q for 2Q12. In the 2Q12 Form 10-Q, the Company described an additional federal investigation, this time into VITAS' Southern California programs for a period of time that included the Relevant Period, regarding patient eligibility for hospice care:

> In June 2012, VITAS received an administrative subpoena from the Office of the Inspector General ("OIG") of the U.S. Department of Health and Human Services in connection with an investigation of possible improper claims submitted to the Medicare and Medicaid Programs. It seeks production to the OIG of various categories of documents concerning the provision of hospice services, for headquarters and its Southern California programs, for the period January 1, 2007 through the date of the subpoena. The categories of documents include policy, procedure and training manuals; documents concerning patient eligibility for hospice care, including referrals, admissions, certification, revocations and census information; documents concerning claims submitted to government programs; certain information concerning employees and their compensation; and documents concerning VITAS' financial performance. We are conferring with the U.S. Attorney's Office for the Central District of California regarding the document requests. We cannot predict the timing or outcome of this investigation, or estimate our potential liability, if any.

198. The OIG's investigation into VITAS' operations in California was preceded by the filing of a *qui tam* complaint on January 27, 2012, by Dr. Charles Gonzales, who was employed by VITAS Los Angeles from 2004 until May, 2011. During Dr. Gonzales' tenure with VITAS, he alleged that the Company submitted "thousands" of false certifications of hospice eligibility to Medicare for patients in Los Angeles. While employed by VITAS, Dr. Gonzales was subjected to "constant and strong pressure" from management to certify and/or recertify patients as eligible for hospice care who were not eligible, and cited 34 separate,

specific cases where patients were improperly certified or recertified as eligible for hospice care under Medicare's rules and regulations. The average hospice stay for the 34 patients listed in his complaint was two years, seven months. His complaint, initially filed in the Central District of California, was transferred to the Western District of Missouri on April 5, 2013 and unsealed on April 6, 2013. On May 2, 2013, the DOJ filed a notice of intervention in Dr. Gonzales' case.

199.    On November 2, 2012, the Company issued its Form 10-Q for 3Q12. In the 3Q12 Form 10-Q, the Company announced its receipt of a subpoenas from the Florida Attorney General's office, the unsealing of two additional *qui tam* complaints, and details surrounding its receipt of additional subpoenas from the OIG:

> In July 2012, VITAS received an investigative subpoena from the Florida Attorney General seeking documents previously produced in the course of prior government investigations as well as, for the period January 1, 2007 through the date of production, billing records and procedures; information concerning business results, plans, and strategies; documents concerning patient eligibility for hospice care; and certain information concerning employees and their compensation. We are conferring with the Attorney General regarding those document requests.

> In June 2011, the U.S. Attorney provided the Company with a partially unsealed qui tam complaint filed under seal in the U.S. District Court for the Western District of Texas, *United States, et al. ex rel. Urick v. Vitas HME Solutions, Inc. et al.*, 5:08-cv-0663. The U.S. Attorney filed a notice in May 2012 stating that it had decided not to intervene in the case at that time but indicating that it continues to investigate the allegations. In June 2012, the complaint was unsealed. The complaint asserts violations of the federal False Claims Act and the Texas Medicaid Fraud Prevention Act based on allegations of a conspiracy to submit to Medicare and Medicaid false claims involving hospice services for ineligible patients, unnecessary medical supplies, failing to satisfy certain prerequisites for payment, and altering patient records, including backdating patient revocations. The suit was brought by Barbara Urick, a registered nurse in VITAS's San Antonio program, against VITAS, certain of its affiliates, and several former VITAS employees, including physicians Justo Cisneros and Antonio Cavasos and nurses Sally Schwenk, Diane Anest, and Edith Reed. In September 2012, the plaintiff dismissed all claims against the individual defendants. The complaint has yet to be served on any of the VITAS entities.

> Also in June 2011, the U.S. Attorney provided the Company with a partially unsealed qui tam complaint filed under seal in the U.S. District Court for the

Northern District of Illinois, *United States, et al. ex rel. Spottiswood v. Chemed Corp.*, 1:07-cv-4566. In April 2012, the complaint was unsealed. The U.S. Attorney and Attorney General for the State of Illinois filed notices in April and May 2012, respectively, stating that they had decided not to intervene in the case at that time but indicating that they continue to investigate the allegations. The complaint asserts violations of the federal False Claims Act and the Illinois Whistleblower Reward and Protection Act based on allegations that VITAS fraudulently billed Medicare and Medicaid for providing unwarranted continuous care services. The suit was brought by Laura Spottiswood, a former part-time pool registered nurse at VITAS, against Chemed, VITAS, and a VITAS affiliate. The complaint has yet to be served.

In June 2012, VITAS received an administrative subpoena from OIG in connection with an investigation of possible improper claims submitted to the Medicare and Medicaid programs. It seeks production of various categories of documents concerning the provision of hospice services, for headquarters and its Southern California programs, for the period January 1, 2007 through the date of the subpoena. The categories of documents include policy, procedure and training manuals; documents concerning patient eligibility for hospice care, including referrals, admissions, certifications, revocations and census information; documents concerning claims submitted to government programs; certain information concerning employees and their compensation; and documents concerning VITAS's financial performance.

In August 2012, the OIG also subpoenaed medical records for 268 patients from three Southern California programs. We are conferring with the U.S. Attorney's Office for the Central District of California regarding those document requests.

200. The statements referenced above in ¶ 199 were materially false and misleading when made because they did not disclose the VITAS's violations of law and the Company's material deficiencies in its internal controls. *See* ¶¶ 137, 162, 181.

**(20)    The February 27, 2013 Form 10-K for FY2012**

201. On February 27, 2013, Chemed filed its annual report for the year ended December 31, 2012 on Form 10-K ("2012 10-K"), which was reviewed, approved, and signed by each of the Director Defendants as well as Defendants McNamara and Williams. The 2012 10-K reported the Company's financial results for fiscal year 2012. The 2012 10-K described Medicare's billing audits and claims review process, stating, in pertinent part, as follows:

Billing Audits/Claims Reviews. *The Medicare program and its fiscal intermediaries and other payors periodically conduct pre-payment or post-payment reviews and other reviews and audits of health care claims, including hospice claims.* There is pressure from state and federal governments and other payors to scrutinize health care claims to determine their validity and appropriateness. In order to conduct these reviews, the payor requests documentation from Vitas and then reviews that documentation to determine compliance with applicable rules and regulations, including the eligibility of patients to receive hospice benefits, the appropriateness of the care provided to those patients and the documentation of that care. Vitas' claims have been subject to review and audit. We make appropriate provisions in our accounting records to reduce our revenue for anticipated denial of payment related to these audits and reviews. *We believe our hospice programs comply with all payor requirements at the time of billing.* However, we cannot predict whether future billing reviews or similar audits by payors will result in material denials or reductions in revenue.

202. The statements referenced in the 2012 10-K that VITAS' "hospice programs comply with all payor requirements at the time of billing" were materially false and misleading when made for the reasons detailed above in ¶¶ 137, 162, and 181. The Director Defendants specifically reviewed, approved and signed the 2012 Annual Report, including its statements about Chemed's compliance with legal and regulatory matters. Moreover, before signing the 2012 Form 10-K, the Audit Committee Defendants (Defendants Rice, Saunders and Grace) specifically discussed with both the Company's management and outside auditors the financial statements contained in the annual report and the representations regarding the adequacy of Chemed's internal controls. The Proxy Statement filed with the SEC on April 5, 2013 contained an "Audit Committee Report" which was signed by Defendants Rice, Saunders and Grace which stated:

"1. *The Audit Committee [Rice, Saunders and Grace] has reviewed and discussed the audited financial statements and management's report on internal control over financial reporting with the Company's management.*"

"2. *The Audit Committee has discussed with the independent accountants the matters required to be discussed by SAS 61.*"

"3. The Audit Committee has received the written disclosures and the letter from the independent accountants required by the applicable requirements of the Public

Company Accounting Oversight Board regarding the independent accountants' communications with the Audit Committee concerning independence and has discussed with the independent accountants the independent accountants' independence."

"4. Based on the review and discussion referred to in paragraphs (1) through (3) above, *the Audit Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2012, for filing with the SEC.*"

### (21) April 26, 2013 1Q13 Form 10-Q

203. On April 26, 2013, the Company filed its quarterly report for the first quarter of 2013 on Form 10-Q (the "Q1 2013 10-Q"). On February 27, 2013, in its 2012 Form 10-K, the Company had announced that it received additional subpoenas from the OIG seeking medical records of VITAS patients. The Form 10-Q also stated, in pertinent part, as follows:

As of March 31, 2013, VITAS has approximately $1.1 million in unbilled revenue included in accounts receivable (December 31, 2012 - $457,000). The unbilled revenue at VITAS relates to hospice programs currently undergoing various patient file reviews. Surveyors working on behalf of the U.S. Federal government review certain patient files for compliance with Medicare regulations. During the time the patient file is under review, we are unable to bill for care provided to those patients. We make appropriate provisions to reduce our accounts receivable balance for any governmental or other payer reviews resulting in denials of patient service revenue. *We believe our hospice programs comply with all payer requirements at the time of billing.* However, we cannot predict whether future billing reviews or similar audits by payers will result in material denials or reductions in revenue.

204. The statements referenced above in the Q1 2013 10-Q that VITAS' "hospice programs comply with all payor requirements at the time of billing" were materially false and misleading when made for the reasons detailed above in ¶¶ 137, 162, and 181.

205. In the Q1 2013 Form 10-Q, the Company reported the voluntary dismissal of the *Rehfeldt* action. The Company also reported that the Company had been served with the *qui tam* complaints filed in the Western District of Texas and the Northern District of Illinois.

- 92 -

206.   The *Rehfeldt* action was voluntarily dismissed by Rehfeldt for procedural reasons.  In an article entitled "Whistle-blower drops suit against hospice company" published by Patrick Danner on April 16, 2013 on the "MY San Antonio" homepage,[8] Rehfeldt, through his attorney, stated: "We stand by every allegation in that complaint, and we look forward to those allegations coming to light."  As the article explains, "[u]nder provisions of the federal False Claims Act, a whistle-blower is barred from bringing a claim if the same allegations already have been made in another lawsuit."  Because the *Urick* complaint, referenced in ¶ 199, had been filed before Rehfeldt's complaint, alleging substantially the same fraudulent conduct by VITAS, Rehfeldt's complaint had to be dismissed.

207.   On May 2, 2013, the DOJ filed a Complaint against Chemed and VITAS alleging that Chemed and VITAS had engaged in a widespread and pervasive scheme to inappropriately admit patients into hospice care and that Chemed and VITAS placed patients into continuous care who did not qualify, that this plan worked, and that Chemed and VITAS fraudulently billed Medicare for these inappropriate admissions.  The Company discussed the filing of the DOJ Complaint in a Form 8-K filed on May 3, 2013:

> On May 2, 2013, the government filed a False Claims Act complaint against the Company and certain of its hospice-related subsidiaries in the Western District of Missouri, captioned as United States of America v. VITAS Hospice Services, LLC, et al., Case #4:13-cv-00449-BCW.  The complaint alleges that, since at least 2002, Vitas, and since 2004, the Company, submitted or caused the submission of false claims to the Medicare program by (a) billing Medicare for crisis care services when the patients were not eligible, the services were not provided, or the medical care was inappropriate, and (b) admitting patients who were not eligible for the Medicare hospice benefit because they did not have a life expectancy of six months or less if their illnesses ran their normal course.  The complaint seeks treble damages, statutory penalties, and the costs of the action, plus interest.

---

[8]      http://www.mysanantonio.com/business/article/Whistle-blower-drops-suit-against-hospice-company-4442855.php.

208.     In response to the announcements about the DOJ Complaint, the trading price of the Company's stock fell $13.79 per share, or 16.86%, to close at $68.00 per share on May 3, 2013, on extremely heavy trading volume.

**(22)    Additional Allegations Regarding the Officer Defendants' Knowledge of the Wrongdoing and of the Falsity of the Statements They Made During the Relevant Period**

209.     During the Relevant Period, the Officer Defendants were motivated to keep Chemed's stock price artificially inflated in order to line their own pockets.  Chemed had a program that specifically incentivized the Officer Defendants to attain and sustain a target share price and rewarded them handsomely for meeting those stock price targets.  This plan, called the Executive Long-Term Incentive Plan ("LTIP") set stock price benchmarks for the Individual Defendants during the Relevant Period.  If the stock price benchmark was achieved during 30 trading days out of any 60 trading day period between May 2009 and February 28, 2012, the Individual Defendants would be given a stock award from a pre-determined pool of shares.  For each benchmark attained, the Individual Defendants would be rewarded as detailed below:

|  | May 2009 Price Targets for the three years ending February 28, 2012[9] | | |
|---|---|---|---|
| Price target | $54.00 | $58.00 | $62.00 |
| Number of shares in the pool | 22,500 | 33,750 | 33,750 |
| Shares awarded: | | | |
| From the pool | 22,500 | 33,750 | 33,750 |
| Discretionary shares | 5,400 | 7,350 | 7,350 |
| **Total shares Awarded** | **27,900** | **41,100** | **41,100** |

210.     During the Relevant Period, the Officer Defendants caused the Company to make false and misleading statements in order to boost Chemed's share price and keep it elevated so

---

[9] 2012 Form 10-K at 15.

they could collect on the LTIP.  In fact, Chemed's stock price exceeded the targets listed above, and the Officer Defendants were awarded LTIP benefits in April 2010, December 2010, January 2011 and February 2011.[10]  In total, the Officer Defendants reaped benefits of $3,693,764 due to the artificial inflation of Chemed's stock.

**LTIP Benefits Awarded to the Individual Defendants During the Relevant Period**

| Name | LTIP Benefit Grant Date | Number of Shares of Stock | Closing Market Price On Grant Date ($/Share) | Grant Date Fair Value of Award ($)[11] |
|---|---|---|---|---|
| McNamara | 4/16/2010[12] | 5,000 | 56.40 | 283,050 |
|  | 12/9/2010[3] | 7,000 | 62.57 | 439,670 |
|  | 1/14/2011[13] | 7,000 | 63.33 | 441,980 |
|  | 2/18/2011[14] | 8700 | 65.32 | 566,979 |
| **TOTAL** |  |  |  | **$1,731,679** |
| Williams | 4/16/2010[3] | 2,550 | 56.40 | 144,356 |
|  | 12/9/2010[3] | 3,660 | 62.57 | 226,116 |
|  | 1/14/2011[4] | 3,600 | 63.33 | 227,304 |
|  | 2/18/2011[15] | 4,600 | 65.32 | 299,782 |

---

[10]  The awards issued in 4/2010, 12/2010 and 1/2011 were "fully vested Capital Stock"(*see* 2011 Proxy at 15).  The 2/2011 LTIP award was a "time-based LTIP award of 42,000 shares of restricted stock" given to certain key employees including the Individual Defendants. *See* 2012 Form 10-K at 16.

[11]  Amounts represent the aggregate grant date fair value of the awards determined in accordance with FASB's stock based compensation rules.  *See* Note 4 to the Consolidated Financial Statements included as Exhibit 13 to the Company's 2010 and 2011 Annual Report on Form 10-K for a description of the assumptions used in determining the grant date fair value. *See* 2011 and 2012 Proxy at 21 respectively.

[12]  2011 Proxy at 15, 21.

[13]  2012 Proxy at 12, 2011 Proxy at 15.

[14]  2012 Proxy at 12, McNamara Form 4 for the period ending 2/18/2011, footnote 2. Unlike the "fully vested Capital Stock" issued in 4/2010, 12/2010 and 1/2011 (*see* 2011 Proxy at 15), this LTIP award is restricted stock vesting in full on 2/18/2015.

| Name | LTIP Benefit Grant Date | Number of Shares of Stock | Closing Market Price On Grant Date ($/Share) | Grant Date Fair Value of Award ($)[11] |
|---|---|---|---|---|
| **TOTAL** | | | | **$897,558** |
| O'Toole | 4/16/2010[3] | 3,500 | 56.40 | 198,135 |
| | 12/9/2010[3] | 5,000 | 62.57 | 314,050 |
| | 1/14/2011[4] | 4,000 | 63.33 | 252,560 |
| | 2/18/2011[16] | 4,600 | 65.32 | 299,782 |
| **TOTAL** | | | | **$1,064,527** |
| **Defendants TOTAL LTIP Benefit During the Relevant Period** | | | | **$3,693,764** |

211. When information concerning Chemed's violation of federal law was revealed to the market on November 16, 2011, the stock price dropped from a Relevant Period high of $72.25 to $50.65. Notably, when the market partially corrected the artificial inflation in Chemed's stock price, the stock declined to a trading level below even the initial stock price benchmark of $54.00. Without the Officer Defendants' deception, they would not have received any benefits under the LTIP at all. Notably, the Officer Defendants did not meet any of their LTIP goals in 2008 and the Company later announced that it did not expect to meet them in 2012.

212. The Officer Defendants' knowledge of the wrongdoing is further evidenced by their insider trading, as set forth in the chart below:

---

[15] 2012 Proxy at 12, Williams Form 4 for the period ending 2/18/11, footnote 2. Unlike the "fully vested Capital Stock" issued in 4/2010, 12/2010 and 1/2011 (*see* 2011 Proxy at 15), this LTIP award is restricted stock vesting in full on 2/18/2015.

[16] 2012 Proxy at 12, O'Toole Form 4, footnote 2 for the period ending 2/18/11. Unlike the "fully vested Capital Stock" issued in 4/2010, 12/2010 and 1/2011 (*see* 2011 Proxy at 15), this LTIP award is restricted stock vesting in full on 2/18/2015.

**Chemed Corp.**
**(CHE)**
Insider Sales: 2/15/10 - 5/2/13

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| **McNamara** | Chief Executive | | | | |
| **(Kevin J)** | Officer | 27-Apr-2010 | 15,000 | $54.76 | $821,400 |
| | | 28-Oct-2010 | 10,000 | $59.13 | $591,300 |
| | | 04-May-2011 | 5,000 | $69.44 | $347,200 |
| | | 04-Aug-2011 | 10,000 | $56.64 | $566,400 |
| | | 08-Nov-2011 | 5,000 | $58.98 | $294,900 |
| | | 17-Feb-2012 | 8,000 | $62.75 | $502,000 |
| | | 22-Feb-2012 | 4,000 | $62.30 | $249,200 |
| | | 06-Aug-2012 | 10,000 | $61.56 | $615,600 |
| | | 21-Aug-2012 | 6,000 | $66.38 | $398,280 |
| | | 11-Sep-2012 | 6,000 | $69.03 | $414,180 |
| | | 07-Nov-2012 | 7,000 | $68.08 | $476,560 |
| | | 20-Nov-2012 | 6,000 | $66.54 | $399,240 |
| | | 18-Dec-2012 | 5,000 | $69.09 | $345,450 |
| | | 22-Feb-2013 | 4,000 | $78.26 | $313,040 |
| | | 22-Apr-2013 | 12,000 | $77.61 | $931,320 |
| | | | 113,000 | | $7,266,070 |
| | | | | | |
| **O'Toole** | Officer | | | | |
| **(Timothy S)** | | 25-Mar-2010 | 108 | $55.20 | $5,962 |
| | | 25-Mar-2010 | 669 | $55.24 | $36,956 |
| | | 25-Mar-2010 | 723 | $55.22 | $39,924 |
| | | 25-Mar-2010 | 2,000 | $55.16 | $110,320 |
| | | 05-May-2010 | 5,000 | $54.09 | $270,450 |
| | | 11-Nov-2010 | 4,000 | $62.32 | $249,280 |
| | | 12-Jan-2011 | 6,000 | $63.31 | $379,860 |
| | | 08-Mar-2011 | 3,000 | $66.72 | $200,160 |
| | | 11-May-2011 | 8,000 | $70.91 | $567,280 |
| | | 29-Feb-2012 | 3,700 | $62.20 | $230,140 |
| | | 24-Sep-2012 | 6,000 | $71.51 | $429,060 |
| | | 23-Apr-2013 | 12,000 | $78.44 | $941,280 |
| | | | 51,200 | | $3,460,671 |
| | | | | | |
| **Williams** | Chief Financial | | | | |
| **David Patrick** | Officer | 30-Apr-2010 | 3,000 | $55.77 | $167,310 |
| | | 09-Dec-2010 | 7,000 | $62.64 | $438,480 |
| | | 22-Feb-2011 | 15,000 | $65.33 | $979,950 |
| | | 08-Aug-2012 | 5,000 | $62.45 | $312,250 |
| | | 11-Sep-2012 | 5,000 | $69.17 | $345,850 |
| | | 09-Nov-2012 | 10,000 | $66.66 | $666,600 |
| | | 28-Feb-2013 | 10,000 | $76.77 | $767,700 |
| | | | 55,000 | | $3,678,140 |
| | | | | | |
| | | **Totals:** | **219,200** | | **$14,404,881** |

213. In addition, while Defendant O'Toole exercised 20,000 stock options for the 39 month period before the Relevant Period and did not exercise any stock options after the Relevant Period, he exercised a total of 128,750 stock options during the Relevant Period.[17] Defendant Williams exercised 518,750 stock options during the Relevant Period[18] and 70,000[19] in the 39 month time frame before the Relevant Period, but has not exercised any stock options since the end of the Relevant Period. Defendant McNamara exercised 290,000[20] stock options during the Relevant Period and 126,400[21] in the 39-month time frame before the Relevant Period and did not exercise any stock options since the end of the Relevant Period.

214. In addition, as alleged herein, all the Individual Defendants had knowledge of the falsity of the statements they caused Chemed to make in that all Defendants knew, or were reckless in not knowing, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Chemed, their control over, and/or receipt and/or modification of Chemed's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy

---

[17] *See* O'Toole Form 4s for 2/27/07, 2/24/10, 6/4/10, 5/5/11, 11/9/11, 8/8/12, 12/19/12, 3/1/13 and 4/24/13.

[18] *See* Williams Form 4s for 12/9/10, 2/22/11, 9/12/12, 2/22/13 and 4/26/13.

[19] *See* Williams Form 4s for 11/11/08 and 8/11/09 (pre-Relevant Period).

[20] *See* McNamara Form 4s for 4/26/10, 10/29/10, 5/3/11, 11/9/11, 2/16/12, 8/7/12, 8/22/12, 9/11/12, 11/7/12, 11/20/12, 12/18/12, 2/25/13 and 4/23/13.

[21] *See* McNamara Form 4s for 10/24/08, 11/10/08, 8/3/09 and 11/3/09.

to confidential proprietary information concerning Chemed, participated in the unlawful scheme alleged herein.

215. The DOJ Complaint also provides additional evidence of defendants' knowledge of the falsity of the statements they caused the Company to make during the Relevant Period. *See supra*.

> ### THE INDIVIDUAL DEFENDANTS' FAILURE TO ENSURE ADEQUATE INTERNAL CONTROLS AT THE COMPANY HAVE SUBJECTED THE COMPANY TO MULTIPLE LAWSUITS ALLEGING FAILURE OF THE COMPANY TO PAY OVERTIME AND FAILURE TO PAY FOR REST BREAKS, AND THE COMPANY HAS BEEN FORCED TO PAY **OVER $21 MILLION** TO SETTLE SUCH CLAIMS <u>AND INCUR MILLIONS MORE IN LEGAL FEES AND EXPENSES</u>

216. Chemed is a significant employer, employing thousands of individuals across the United States. For example, on December 31, 2007, Chemed Corporation had a total of 11,783 employees. Thus, it is imperative that the Company maintain adequate internal controls to ensure that the Company complies with all applicable federal and state laws regarding its operations.

217. Indeed, in light of the importance of wages to individuals, most States have laws which are highly protective of individuals' rights to promptly receive all wages to which they are entitled.

218. During the Relevant Period, the Individual Defendants failed to ensure that Chemed had adequate internal controls regarding compliance with federal and state laws governing wages and labor law.

219. As a result, Chemed has been named as a defendant in multiple class action lawsuits alleging violation of federal and state labor laws, and has been forced to ***pay over $21 million to settle various such cases***.

220. **$14.8 Million in Damages/Expenses Related to Roto-Rooter Overtime Case**. In February 2010, Chemed and Roto-Rooter were named as defendants in a lawsuit filed in the United States District Court for the Eastern District of New York, entitled *Anthony Morangelli, et al., v. Chemed Corp. and Roto-Rooter Services Co.,* No. 10 CV-00876 (BMC). The named plaintiffs in this lawsuit, who are current and former technicians employed by Roto-Rooter who were paid on a commission basis, asserted against Chemed and Roto-Rooter claims for violation of the Fair Labor Standards Act ("FLSA") and claims for violations of the labor laws of multiple states. In June 2013 the parties reached an agreement to settle the case for $14.3 million plus applicable payroll taxes ($9.0 million total after tax), which is subject to Court approval. As such, the Company was forced to record a $14.8 million operating expense in the quarter ended June 30, 2013 Statement of Income. This amount does not include attorneys' fees and costs the Company was forced to incur and expend during the litigation of the action. On September 18, 2013, the court granted preliminary approval to the settlement (because the case was brought as a class action, the settlement requires court approval).

221. **$6.5 Million in Damages in California Wage and Hour Litigation**. VITAS was sued as a defendant in a class action lawsuit filed in the Superior Court of California, Los Angeles County in September 2006 by Bernadette Santos, Keith Knoche and Joyce White, *Bernadette Santos, et al. v. Vitas Healthcare Corporation of California*, BC359356. This case alleges failure to pay overtime and failure to provide meal and rest periods to a purported class of California admissions nurses, chaplains and sales representatives. The case seeks payment of penalties, interest and Plaintiffs' attorney fees.

222. In October 2013, VITAS settled the case, subject to court approval, As a result, VITAS was forced to record an after-tax expense in the quarter of $6.5 million. This amount

does not include attorneys' fees and costs the Company was forced to incur and expend during the litigation of the action.

## THE INDIVIDUAL DEFENDANTS' FAILURE TO ENSURE ADEQUATE INTERNAL CONTROLS AT THE COMPANY HAVE SUBJECTED THE COMPANY TO MULTIPLE LAWSUITS ALLEGING THAT THE COMPANY DEFRAUDED THE U.S. GOVERNMENT AND SHAREHOLDERS

223.    As noted *supra*, on May 2, 2013, the government filed a False Claims Act complaint against the Company and certain of its hospice-related subsidiaries in the Western District of Missouri, captioned as *United States of America v. VITAS Hospice Services, LLC, et al.*, Case #4:13-cv-00449-BCW.  The complaint alleges that, since at least 2002, Vitas, and since 2004, the Company, submitted or caused the submission of false claims to the Medicare program.  The case seeks hundreds of millions of dollars in damages, which would be tripled automatically under the False Claims Act if the government prevails at trial.  As Chemed has admitted in its annual reports throughout the Relevant Period:  "*Federal False Claims Acts.* The federal law includes several criminal and civil false claims provisions, which provide that knowingly submitting claims for items or services that were not provided as represented may result in the imposition of multiple damages, administrative civil money penalties, criminal fines, imprisonment, and/or exclusion from participation in federally funded healthcare programs, including Medicare and Medicaid.  In addition, the OIG may impose extensive and costly corporate integrity requirements upon a healthcare provider that is the subject of a false claims judgment or settlement. These requirements may include the creation of a formal compliance program, the appointment of a government monitor, and the imposition of annual reporting requirements and audits conducted by an independent review organization to monitor compliance with the terms of the agreement and relevant laws and regulations."

224.     The Company has also been sued as a defendant in a securities fraud class action lawsuit captioned *In re Chemed Corp. Securities Litigation*, Civil Action No. 1:12-cv-28 (S.D. Ohio).

225.     These lawsuits and the wrongdoing committed by the Individual Defendants pose a threat that VITAS may become ineligible for Medicare and/or Medicaid reimbursement. Any such action would irreparably harm the Company and its profits and revenues.

### THE INDIVIDUAL DEFENDANTS' FAILURE TO ENSURE ADEQUATE INTERNAL CONTROLS AT THE COMPANY HAVE SUBJECTED THE COMPANY TO POTENTIAL LOSS OF ELIGIBILITY FOR MEDICARE AND MEDICAID REIMBURSEMENT

226.     As alleged herein, the revenues VITAS receives from Medicare and Medicaid reimbursement for hospice services are highly material from a financial point of view to Chemed. Moreover, as Chemed stated in its 2012 Annual Report: *"Over 90% of Vitas' revenue consisted of payments from the Medicare and Medicaid programs."* The Annual Report also states that: *"Vitas is highly dependent on payments from Medicare and Medicaid. If there are changes in the rate or methods governing these payments, Vitas' net patient service revenue and profits could materially decline."*

227.     As Chemed disclosed in its 2012 Annual Report: "Vitas' hospices are required to meet certain conditions of participation to be eligible to receive payments as hospices under Medicare and Medicaid programs. All of Vitas' hospices, other than those currently in development, are certified for participation as hospices in the Medicare program, and are also eligible to receive payments as hospices from the Medicaid program in each of the states in which Vitas operates. Vitas' hospices are subject to periodic survey by governmental authorities or private accrediting entities to assure compliance with state licensing, certification and accreditation requirements."

228.     As Chemed also acknowledged in its 2012 Annual Report: "Federal regulations require that a hospice program satisfy certain Conditions Of Participation ("COP") to be certified and receive Medicare payment for the services it provides. Failure to comply with the conditions of participation may result in sanctions, up to and including decertification from the Medicare program."

229.     Due to the significant portion of Chemed's business that is reliant on compliance with the COP, the Individual Defendants know that it would be catastrophic for the Company and its shareholders if the Company were to become non-compliant with the COP.

230.     Indeed, as stated by Chemed in its 2012 Annual Report: "*Claims Review*. The Medicare and Medicaid programs and their fiscal intermediaries and other payors periodically conduct pre-payment or post-payment reviews and other reviews and audits of health care claims, including hospice claims. As a result of such reviews or audits, Vitas could be required to return any amounts found to be overpaid, or amounts found to be overpaid could be recouped through reductions in future payments." Such statement in the Annual Report was false and misleading because it merely alerted shareholders to the risk that Vitas might be found to be in noncompliance with federal rules and regulations, when in fact Defendants knew that the DOJ had already determined that Vitas was in noncompliance, a finding Defendants already had knowledge about in any event due to their own internal review.

## DAMAGES TO CHEMED

231.     Due to the wrongdoing committed by the Individual Defendants, Chemed has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.  Further, as a direct and proximate result of the Individual Defendants' conduct, Chemed has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     legal fees, settlements, and judgments in the litany of lawsuits filed against the Company for violations of the COP and federal and state rules and regulations pertaining to reimbursement for hospice care, the federal securities laws, other federal and state laws and regulations, and the common law;

(b)     legal fees, costs, and settlements and/or judgments relating to the investigations of the DOJ and State Attorneys General;

(c)     reduced revenues and profits at VITAS due to noncompliance with federal and state rules and regulations;

(d)     loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(e)     amounts paid to outside lawyers, accountants, and investigators in connection with the plethora of lawsuits filed against Chemed, including the shareholder class action lawsuit and the DOJ's False Claims Act case; and

(f)     loss of revenues and profits due to the Individual Defendants' wrongdoing and penalties by the government due to violations of Medicare and Medicaid policies.

## DERIVATIVE ALLEGATIONS

232.    Plaintiff brings this action for the benefit of Chemed to redress injuries caused by the Individual Defendants as a result of the Individual Defendants' violations of law, as well as the aiding and abetting thereof.  Chemed is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

233.     Plaintiff is and has continuously been a Chemed shareholder at all relevant times. Plaintiff therefore will adequately and fairly represent the interests of Chemed in enforcing and prosecuting its rights.

## DEMAND FUTILITY ALLEGATIONS

234.     A pre-suit demand on the Chemed Board is futile, and therefore, excused.  The Board of Chemed as of the filing of this complaint consists of the following ten individuals: Defendants Gemunder, Grace, Krebs, Lindell, Rice, Saunders, Walsh, Wood, Hutton and McNamara.

235.     Demand is futile as to Gemunder, Grace, Krebs, Lindell, Rice, Saunders, Walsh, Wood, Hutton and McNamara because they all directly participated in the wrongdoing alleged herein.  Where, as here, a Board has an even number of directors, a plaintiff need only allege particularized facts demonstrating that there is a reason to doubt the independence or disinterestedness of half the Board members.  Thus, since the Chemed Board consisted of ten members as of the date of the filing of this complaint, Plaintiff need only allege a reason to doubt the independence or disinterestedness of five of such members in order to adequately allege demand futility.

**A.     Demand Is Futile as to All Director Defendants With Respect to the Claims Against McNamara, Williams, and O'Toole**

236.     Counts I – V of this complaint assert claims against Defendants McNamara, Williams and O'Toole (the "Officer Defendants").  Because McNamara himself is a director (whereas Williams and O'Toole are not), demand as to these claims ***is clearly futile as to McNamara*** because he cannot exercise independent and disinterested judgment as to whether to sue himself.  Demand is also futile as to McNamara because he is alleged to have engaged in self-dealing and disloyal conduct for which he received a personal financial benefit.  For

example, Count IV alleges that McNamara received $1,731,679 in unjust enrichment in the form of LTIP compensation that should be returned to Chemed. Count V alleges that McNamara engaged in illegal insider trading, resulting in a personal financial benefit to him of $7,266,070. The receipt of these unlawful and inequitable personal financial benefits renders McNamara interested in the claims. In addition, Chemed admits in its SEC filings that McNamara is not an independent director. As the current President and CEO of Chemed, McNamara is an insider director who derives all of his income from Chemed. McNamara is specifically identified as *not* being an independent director in Chemed's SEC filings. Thus, Plaintiff has alleged a "reason to doubt" the independence and disinterestedness of McNamara.

237. Demand is also futile as to McNamara because he would lose millions of dollars in severance payments were he to agree to sue himself for insider trading, unjust enrichment and breach of fiduciary duty. According to the 2012 Proxy Statement filed by Chemed, as of December 31, 2012 McNamara stands to receive $9,749,027 if he is terminated "without cause" but $0 if he is terminated "for cause." To be entitled to the $9,749,027, however, McNamara is required to execute a release of all claims against Chemed. McNamara clearly would refuse to do so if he was fired "for cause" by Chemed. Thus, McNamara would never, as a Board member being asked to consider suing himself, authorize the Company to fire himself "for cause" since to do so would result in his forfeiture of $9,749,027 in severance payments, plus expose him to paying potential damages to the Company of almost $9 million alone due to his LTIP compensation and insider trading benefits plus millions more for the damages caused to Chemed.

238. With respect to the claims against the Officer Defendants, demand is futile as to the other Director Defendants (Gemunder, Grace, Krebs, Lindell, Rice, Saunders, Walsh,

Wood, and Hutton) because they have wrongfully refused to bring suit against the Officer Defendants.  Despite the millions of dollars in damages the Officer Defendants have caused Chemed, the Director Defendants have failed to sue Defendants McNamara, Williams and O'Toole for their wrongdoing.  Such failure demonstrates not just theoretical demand futility but actual demand futility.  Even after the U.S. Department of Justice filed a False Claims Act complaint against Chemed, seeking hundreds of millions of dollars in damages caused under the watch of McNamara, Williams and O'Toole, the Director Defendants have done nothing to seek recovery against the Officer Defendants.

239.    Demand is futile as to Director Defendant Hutton  with respect to the decision of whether to sue the Officer Defendants because Hutton is currently a Vice President of Chemed and thus is also, like McNamara, an inside and interested director.  Like McNamara, Chemed specifically states in its SEC filings that Hutton does not meet the requirements for being considered an independent director.  Thus, demand is futile as to Hutton with respect to the decision as to whether Hutton's fellow executive officers (Defendants McNamara, Williams and O'Toole) should be sued.

240.    Moreover, demand is futile as to all the Director Defendants with respect to the decision of whether to sue the Officer Defendants due to unique and restrictive terms in the Officer Defendants' employment agreements.  Such terms make it highly unlikely that the Company would ever sue the Officer Defendants, thus demonstrating the futility of making any demand that the Company sue the Officer Defendants.  A claim brought derivatively by a shareholder against the Officer Defendants, on the other hand, is not encumbered by such restrictions and thus is a better course for Chemed.  Specifically, all the Officer Defendants have employment agreements with Chemed that contain a very narrow and restrictive definition

of the circumstances under which Chemed may terminate the employment of the Officer Defendants "for cause." For example, the agreements limit a termination "for cause" to circumstances where the executive has been convicted of a felony, has willfully and repeatedly failed to substantially perform his duties, or where the executive has engaged in "willful gross misconduct or gross negligence in connection with his employment." These restrictions are very narrow, and severely limit the ability of the Company to fire the Officer Defendants "for cause." Notably, the definition of "for cause" in the employment agreements does not even state that the Company can fire McNamara, Williams or O'Toole for cause even if they have engaged in self-dealing, such as is alleged herein in Counts IV and V for unjust enrichment and insider trading.

241. The repercussions of the restrictive "for cause" language on the issue of demand futility are evident upon review of the Company's proxy statement. The Director Defendants would never authorize suit against the Officer Defendants because, due to the restrictive "for cause" language in the Officer Defendants' employment agreements, the Company would face a significant risk of having to pay millions of dollars in severance payments to the Officer Defendants if a court determined that Chemed fired the Officer Defendants for a reason that does not fall within the "for cause" language. As noted above, McNamara's employment agreement entitled him, as of December 31, 2012, to $9,749,027 in severance payments if he is fired "without cause." Williams' contract entitles him as of 12/31/12 to $3,397,151 in severance payments, and O'Toole's contract guarantees him $3,859,787 in severance payments as of 12/31/12 if he is fired without cause. These amounts only increase as such executives' employment continues. Thus, were the Board to authorize Chemed to sue McNamara, Williams and/or O'Toole, it would have to fire them "for cause" and risk having a court later determine

that the reason proffered by Chemed for their firing did not fall within the limited grounds under the employment agreement for firing the executives "for cause." If the court made such a determination, **then the Company would be required to immediately pay the Officer Defendants $17,005,965 in severance payments**, in addition to its ongoing obligation to advance the Officer Defendants' legal fees and expenses in the lawsuit.

**B.      Demand is Futile as to all Director Defendants With Respect to Counts I – III**

242.     The Director Defendants were responsible for reviewing and approving the Company's financial statements. By authorizing the false financial statements and public statements alleged herein which were made beginning in February 2010, and by signing the annual reports on Form 10-K filed with the SEC during the Relevant Period, and by failing to correct other statements which the Officer Defendants made during such time, the Director Defendants were active participants in breaches of candor and duty, and have subjected the Company to lawsuits claiming violations of the federal securities laws and an investigation by the United States Department of Justice. A director's breach of the duty of candor is not entitled to protection under the business judgment rule. As a result, any demand upon the Director Defendants to bring suit against themselves or the Officer Defendants would be a useless and futile act.

243.     All the Director Defendants face a substantial likelihood of liability for causing Chemed to engage in **illegal and unlawful conduct**. The United States Department of Justice has alleged that Chemed engaged in a long-standing and concerted illegal scheme to violate federal law and Medicare rules and regulations. The business judgment rule protects a wide variety of business decisions, but does not protect a corporation's officers and directors from causing a company to engage in illegal and unlawful conduct. Here, Vitas accounted for over 70% of Chemed's revenues during the Relevant Period and was the Company's "core product."

The Director Defendants were specifically responsible for ensuring that Chemed had adequate internal controls regarding Vitas' compliance with Medicare and Medicaid rules and regulations and the COP. Thus, the Director Defendants are directly responsible for Chemed's failure to adopt and implement such internal controls, and for the substantial damages Chemed is subject to in the DOJ False Claims Act lawsuit (which seeks hundreds of millions of dollars in damages) and in the shareholder class action lawsuit. As such, all the Director Defendants face a substantial likelihood of liability for the claims asserted herein. Demand is therefore futile.

244. As alleged herein, all the Director Defendants had actual knowledge, or recklessly disregarded, Vitas' violations of Medicare and Medicaid rules and regulations and Chemed's lack of adequate internal controls. Far from constituting mere "red flags," the information available to the Director Defendants during the Relevant Period constituted *actual knowledge* of Vitas' violation of law due to the numerous lawsuits and subpoenas Chemed received during the Relevant Period, which were discussed by the Director Defendants in Chemed's Forms 10-K filed with the SEC and signed by each Director Defendant. A director's knowing or reckless breach of fiduciary duty constitutes bad faith under Delaware law. Bad faith conduct is not protected under the business judgment rule. Thus, demand is excused as to all Director Defendants.

245. Defendants Rice, Saunders and Grace are the current members of the Audit Committee, and were members of the Audit Committee during the entire Relevant Period. The Audit Committee Charter states: "The Audit Committee is appointed by the Board to assist the Board in monitoring (1) the integrity of the financial statements of the Company, (2) the compliance by the Company with legal and regulatory requirements, and (3) the independence and performance of the Company's internal and external auditors."

246. Pursuant to Chemed's Audit Committee Charter, Defendants Rice, Saunders and Grace were specifically required to: "Review the annual audited financial statements with management and the independent auditor prior to the filing by the Company of its annual report on Form 10-K, including Management's Report on Internal Control Over Financial Reporting and other significant financial reporting matters related thereto."

247. During the Relevant Period, Defendants Rice, Saunders and Grace had actual knowledge that Chemed's internal controls were inadequate and that Chemed's VITAS business was violating various federal and state laws regarding Medicare and Medicaid. Knowing and/or reckless conduct by a director constitutes bad faith and is not entitled to the protection of the business judgment rule. Thus, demand is futile. Specifically, Chemed's Board meets a minimum of five times per year. In 2010, the Board met nine (9) times. In 2011, the Board met five (5) times. In 2012, the Board met seven (7) times. Throughout such time, including at some of the Board meetings, Defendants Rice, Saunders and Grace were provided with detailed reports from the VITAS Compliance Officer, whose specific duty it was to handle risk management at VITAS and report on any violations of laws, including VITAS' compliance with Medicare and Medicaid rules and regulations. Rice, Saunders and Grace also received periodic reports regarding VITAS from Chemed's CFO (Defendant Williams) and from Defendant O'Toole, the CEO of VITAS. As a result of such reports, Defendants Rice, Saunders and Grace were advised of the ongoing governmental investigations of VITAS as well as significant deficiencies in VITAS' compliance with Medicare and Medicaid rules and regulations.

248. In addition, Chemed management maintains its formal ERM program that monitors management's actions in response to the key risks facing the Company. The Audit

Committee (Defendants Rice, Saunders and Grace) reviews the ERM program periodically during the year. It oversees Chemed's risk identification and mitigation process. It reviews material financial risk exposures including regulatory matters involving VITAS. Members of Chemed management, including the Chief Legal Officer, VITAS Compliance Officer, the Director of Internal Audit, and Defendants McNamara, Williams and O'Toole regularly report to the Audit Committee throughout the year regarding the ERM program and any material risks to the Company. During the Relevant Period, the Audit Committee also reviewed legal matters that posed a significant risk to Chemed, including the governmental investigations and lawsuits detailed herein.

249.     Indeed, the Director Defendants, all of whom have been on the Board since at least 1994, have had personal knowledge of VITAS' violation of Medicare rules for over seven (7) years, but have done nothing to bring Chemed into compliance with the law. Indeed, the DOJ complaint filed in May 2013 alleges that the violations persist to this day. As just one example of the Director Defendants' actual knowledge, Chemed's 2006 Annual Report admitted that the directors were aware of these critical issues due to two significant events which occurred in 2005: (1) VITAS' receipt of a subpoena from the OIG; and (2) the filing of a *qui tam* complaint alleging VITAS' violation of Medicare rules. Chemed's 2006 Annual Report, which was reviewed, approved, and signed by all Director Defendants, states that the Company had announced on April 7, 2005 VITAS' receipt of a civil subpoena by the OIG, which related to "VITAS' alleged failure to appropriately bill Medicare and Medicaid for hospice services. As part of this investigation, the OIG selected medical records for 320 past and current patients from VITAS' three largest programs for review. It also sought policies and procedures dating back to 1998 covering admissions, certifications, recertifications and

discharges.   During the third quarter of 2005 and again in May 2006, the OIG requested additional information from us.  A *qui tam* complaint has been filed in U.S. District Court for the Southern District of Florida.  We are conferring with the U.S. Attorney regarding our defenses to the complaint allegations."  *See* 2006 Annual Report at 30.  The Annual Report also disclosed that Chemed had spent over $1.7 million in legal fees as of 12/31/06 relating to the OIG subpoena and the *qui tam* case.  These violations of law, which still have not been corrected as of the end of 2013, demonstrate that the Director Defendants have abdicated their fiduciary duties to ensure that Chemed and VITAS are in compliance with the law.  Thus, demand is futile as to all the Director Defendants.

250.   Notwithstanding their actual knowledge of legal violations by VITAS and Chemed, Defendants Rice, Saunders and Grace consciously and/or recklessly failed to correct such violations of law.  They thus consciously abdicated their duties as directors of the Company.  As a result of these defendants' abdication of their duties, any demand upon them is futile.

251.   The Director Defendants have failed to take action against those who are responsible for Chemed's violations of law.  The Director Defendants have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks for the corporation for the wrongdoing complained of herein.  Because all the Director Defendants have served on the Chemed board together for five years or more, they have developed professional relationships, are friends and have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.  Thus, demand on the Board is futile, and therefore, excused.

252.    The Individual Defendants' decision to deprive Chemed of compliant internal controls resulted in the inability to ensure that Chemed had accurate books and records.  The fact that allegations of similar wrongdoing alleged herein have been lodged against the Company since at least 2005 (as detailed herein) and have not been corrected demonstrates that at all relevant times Chemed lacked internal controls to prevent such improper conduct and failed to take action to institute such controls even though the Director Defendants were on notice of the problem.  Moreover, the decision to operate a business segment that is entirely contingent upon continued compliance with Medicare rules and regulations without implementing and maintaining sufficient internal controls for compliance with such rules and regulations is not a decision entitled to business judgment protection.  Thus, demand on the Director Defendants is futile, and therefore, excused.

253.    The Chemed Board of Directors is currently comprised of individuals (the Director Defendants named herein) who are close personal friends and have served on the Board together for decades.  For example, Defendant Gemunder has served on the Company's Board since 1977, which is an inordinately long time for one individual to serve on the same Board.  Similarly, Saunders has been on the Board since 1981, Hutton since 1985, and McNamara since 1987.  Such prolonged tenure on the Board has rendered the Director Defendants extremely close to such an extent that it has impaired their ability to be objective and independent concerning a decision to sue themselves or the Officer Defendants.

254.    With respect to Gemunder, he is the former CEO of Omnicare, which was spun off from Chemed in 1981 and which continues to have close ties to Chemed.  Indeed, there is a revolving door of officers and directors between Chemed and Omnicare.  For years after being spun off Chemed, Omnicare subleased its office space from Chemed.  When Chemed spun off

Chemed in 1981, it installed Gemunder as its CEO. When he was CEO of Omnicare, Gemunder and other directors ran the company like a private company. They looked out for the best interests of management, not shareholders. As an August 12, 2010 Cincinnati article noted, the Omnicare board under Gemunder was "a close-knit board with a history of approving generous executive pay." Gemunder was forced out as CEO in 2010 after an activist hedge fund obtained a board seat and agitated for change, but Gemunder was paid handsomely for his departure, as he received a $130 million retirement payout. Referring to Gemunder's ouster at the time in 2010, Paul Hodgson, a senior research associate at The Corporate Library, a Portland, Maine-based analytics firm specializing in corporate governance, stated that the Omincare board was "clearly a board that needed to remake itself."

255. The other close personal relationships between Gemunder and many of the Director Defendants in this case extended not only to the dysfunctional and non-independent Omnicare board, but also to Chemed, where many of such directors also served as officers and/or directors. As an August 12, 2010 article noted at the time:

> "Before the shakeup, five of Omnicare's eight directors, including Gemunder, had held their seats for more than a decade. Board chair Edward L. Hutton and directors Charles H. Erhart and Sandra E. Laney each had been on the board in excess of 20 years."

> "We typically get concerned if directors have been on for 10 years or more because the kinds of relationships you build up over time begins to compromise your independence," Hodgson said. "You start behaving and thinking like an insider."

> Additionally, through early 2008 a majority of the board – including Gemunder – retained close ties to downtown-based Chemed Corp., owner of Vitas Healthcare and Roto-Rooter. Chemed was founded in 1970 by Hutton. In 1981, the company spun off Omnicare, naming Gemunder its president.

> Alongside Gemunder, Erhart, Hutton and Laney each had held seats on the Chemed's board. In May 2008, Andrea R. Lindell, an Omnicare director since 1992, also joined Chemed's board.

"You might typically see one or two directors on a board of this size that have other relationships with a company CEO, but if it gets beyond that level you begin to have serious doubts about whether this board is functioning independently," said Hodgson. "It smacks of networking and chumminess."

256.    Indeed, Omnicare shares a "common corporate DNA" with Chemed.  The ties date back to W.R. Grace & Co., a chemicals and materials firm where Hutton and Erhart both served as executives. Grace took control of locally-based DuBois Soap in 1964 and installed Hutton as president. DuBois, later renamed DuBois Chemicals, ultimately morphed into Chemed.

257.    As particularized herein, to properly prosecute this lawsuit, Chemed directors would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions.  This they will not do.  A majority of the defendants are exposed to potential liability for operating Chemed without the internal controls for compliance that would have detected and prevented the improper misrepresentations to shareholders and violations of Medicare regulations that have occurred over an extended period of time.  Thus, demand on the Director Defendants is futile, and therefore, excused.

258.    The Director Defendants have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  Likewise, these defendants have and will continue to receive substantial remuneration predicated upon Chemed's results.  The acts complained of herein have resulted in economic benefits to defendants through their increased and continuing compensation - without corresponding recognition or accounting for the correlated liability and risk that Chemed was subject to as a result of its lack of internal

controls. The Director Defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation once the risk is accounted for and the penalties and costs are reconciled into Chemed's balance sheet. Thus, demand on the Director Defendants is futile, and therefore, excused.

259. Demand on the Individual Defendants is futile because when given an opportunity to undertake action to correct the violations of federal and state law by Chemed and VITAS, the Board did nothing and merely continued to falsely state in SEC filings that Chemed and VITAS were in compliance with such laws and regulations, including the COP. The DOJ False Claims Act lawsuit, filed in May 2013, alleges based on the DOJ's review of significant internal documents from both Chemed and VITAS, that the Company's violations of these laws continues to the present day. Because, when given the opportunity to fully reveal the extent of wrongdoing and threat to VITAS becoming ineligible for Medicare reimbursement, the Individual Defendants did nothing and instead continued to cause Chemed to lie to the public and shareholders, demand on all the Director Defendants is excused.

260. In light of Chemed's long and troubled history of failing to comply with federal rules and regulations pertaining to the Company's VITAS business, demand on the Board is futile. Since at least 2005, Chemed has repeatedly been confronted with allegations that it failed to comply with the COP and other federal rules and regulations concerning VITAS' hospice care services, has been investigated repeatedly by state and federal agencies and has been threatened with loss of eligibility for Medicare reimbursement due to conduct substantially similar to the allegations herein. The company has repeatedly shown its unwillingness to take the allegations seriously.

261.    Chemed's officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Chemed.  However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Chemed against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Chemed, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Individual Defendants is futile, and therefore, excused.

## COUNT I
### Breach of Fiduciary Duty Against All Defendants

262.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

263.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Chemed's business and affairs, particularly with respect to issues fundamental to the Company's ongoing viability, such as accreditation.

264.    Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Chemed.

265.    In breach of their fiduciary duties owed to Chemed, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee Chemed's business, rendering them personally liable to the Company for breaching their fiduciary duties.

266.    As a direct and proximate result of defendants' breaches of their fiduciary obligations, Chemed has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
### Abuse of Control Against All Defendants

267.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

268.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Chemed, for which they are legally responsible.

269.    As a direct and proximate result of defendants' abuse of control, Chemed has sustained significant damages.  As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Chemed has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III
### Gross Mismanagement Against All Defendants

270.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

271.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties

with regard to prudently managing the assets and business of Chemed in a manner consistent with the operations of a publicly held corporation.

272.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Chemed has sustained significant damages.

273.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

274.    Plaintiff on behalf of Chemed has no adequate remedy at law.

## COUNT IV

### Unjust Enrichment Against the Officer Defendants
### (McNamara, Williams, and O'Toole)

275.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

276.    During the Relevant Period, Defendants received bonuses, stock options and/or similar such compensation from Chemed that were tied to the financial performance of Chemed. Defendants were unjustly enriched thereby.  Defendants McNamara, Williams, and O'Toole received $1,731,679, $897,558, and $1,064,527 in LTIP compensation, respectively, during the Relevant Period.

277.    To remedy Defendants' unjust enrichment, this Court should order them to disgorge not only the gains they made from the bonuses and stock options which were based on inaccurately reported revenues of Chemed, but also the LTIP compensation defendants were awarded.

**COUNT V**

**Insider Trading Against the Officer Defendants**
**(McNamara, Williams, and O'Toole)**

278.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

279.    At the time the Officer Defendants sold their Chemed stock, they knew the information described above, and sold Chemed stock on the basis of such information.

280.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Officer Defendants used for their own benefit when they sold the stock.

281.    At the time of their stock sales, the Officer Defendants knew that the Company's financial results were overstated due to the wrongdoing alleged herein.  Their sales of Company stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

282.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Officer Defendants' fiduciary duties of loyalty and good faith, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

283.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THE FOREGOING REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Chemed and that plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Chemed;

C.     Determining and awarding to Chemed the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.     Directing Chemed and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Chemed and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of VITAS' operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Chemed to nominate at least three candidates for election to the Board; and

       3.       a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations pertaining to the COP, Medicare and Medicaid rules and regulations, and all laws pertaining to hospice care;

      E.      Determining and awarding to Chemed exemplary damages in an amount necessary to punish Individual Defendants and to make an example of defendants to the community according to proof at trial;

      F.      Awarding Chemed restitution from defendants, and each of them;

      G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      H.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 14, 2013             Respectfully submitted,

                                   PARRY DEERING FUTSCHER & SPARKS, P.S.C.
                                   411 Garrard Street
                                   Covington, KY 41011
                                   Telephone: (859) 291-9000
                                   Facsimile: (859) 291-9300

                                   s/Ron Parry
                                   Ron Parry (OH Bar No. 0038027)
                                   One of Plaintiff's attorneys

                                   Francis A. Bottini, Jr.
                                   Albert Y. Chang
                                   BOTTINI & BOTTINI, INC.
                                   7817 Ivanhoe Avenue, Suite 102
                                   La Jolla, CA 92037
                                   Telephone: (858) 914-2001
                                   Facsimile: (858) 914-2002

                                   *Attorneys for Plaintiff*